[No. 50562-4. En Banc. January 11, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. THOMAS ROY HUBBARD, *Petitioner.*

*Julie A. Kesler* of *Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *William L. Downing, Deputy,* for respondent.

UTTER, J.—May statements by a defendant, elicited by the State in violation of the rule set forth in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), be used as substantive evidence to rebut the testimony of a person other than the defendant?

We hold they may not and reverse the judgment of the Court of Appeals. *State v. Hubbard,* 37 Wn. App. 137, 679 P.2d 391 (1984).

Thomas R. Hubbard was accused of shooting Peter Edwards, a heroin dealer. The murder occurred at about 10 p.m., June 1, 1981. Prior to trial, Hubbard moved to suppress any statements he may have made to the police and to his parole officer following his arrest. At the hearing on this motion, Detective Joe Sanford testified that he and Detective Jarvie had arrested Hubbard at his home at about 5:20 p.m., June 2, 1981. Sanford advised Hubbard of his constitutional rights "from a standard MIR card" as they drove to the Public Safety Building. Hubbard acknowledged that he understood his rights and told the officers that he had spent the previous night with his girl friend. At about this time, Hubbard told Detective Jarvie that "he didn't want to waive his rights, he wanted to talk to his parole officer, Diane Schneider." Verbatim Report of Proceedings, at 13.

Schneider testified that she met with Hubbard at the jail on the morning of June 3. She served him with a "parole suspension paper" and asked him why he was in jail. He replied "they [are] trying to charge [me] with killing a guy." When Schneider asked Hubbard why the police suspected him of the murder, he said that a witness had given them his name. Schneider next asked Hubbard whether he had been in the area at the time of the killing. Hubbard admitted that he had been in the area. Schneider then sketched a diagram of the murder scene and asked Hubbard to place himself at the scene. He did so. Then, in response to Schneider's question, "Well, did you see anything?", Hubbard said, "Well, I saw too much." Schneider asked for more details and Hubbard replied, "Well, can I talk to you confidentially?" Schneider then told Hubbard that his statements would not be kept in confidence. Hubbard "didn't say too much after that." Verbatim Report of Proceedings, at 19.

Schneider conceded that she did not tell Hubbard, before

speaking with him in jail, that anything he said to her could be used against him in court. She also testified, however, that she had explained to him, about 3 or 4 months before his arrest, that she had to tell the truth in her parole reports.

At the suppression hearing, the court determined that Hubbard's initial statements to the police officers could be used in the State's case in chief. The court also ruled, however, that Hubbard's statements to Schneider had been obtained involuntarily, in violation of *Miranda,* and were thus inadmissible in the State's case in chief. The ruling stated that statements to Schneider could nevertheless be used "in rebuttal." The State did not introduce any of Hubbard's post–arrest statements in its case in chief.

Hubbard did not testify in the defense case in chief. However, his girl friend, Katherine Williams, testified that he spent the evening and night of June 1, 1981, at her house. According to Williams' testimony, neither he nor she left the house after about 6:30 that evening.

Over defense objections, the trial judge allowed the State to call parole officer Schneider as a rebuttal witness. She related the statements Hubbard had made to her after his arrest.

Defense counsel then called Hubbard to testify on surrebuttal. On direct examination, Hubbard testified that he had only been attempting to relate to Schneider what another inmate had told him about the killing. Under cross examination, Hubbard denied killing Edwards and said that he had been with his girl friend that night.

The jury returned a verdict of guilty and Hubbard appealed.

# I

■ The Court of Appeals affirmed the guilty verdict by concluding that Hubbard's statements to his parole officer were not the result of interrogation by law enforcement officers nor made without prior advice of his right to remain silent. *State v. Hubbard,* 37 Wn. App. at 142. The appellate

court reached this conclusion even though the State did not assign error to the trial court's *Miranda* ruling. Without assignment of error, the trial court's suppression ruling became the law of the case, not subject to review by the Court of Appeals. *Kaler v. Puget Sound Bridge & Dredging Co.*, 72 Wash. 497, 499, 130 P. 894 (1913); *South Hill Sewer Dist. v. Pierce Cy.*, 22 Wn. App. 738, 748, 591 P.2d 877 (1979). Furthermore, RAP 12.1 requires the appellate court to "decide a case only on the basis of issues set forth by the parties in their briefs." The conclusion by the suppression hearing judge that Hubbard's statements to his parole officer must be excluded stands.

## II

The Court of Appeals gave "an additional ground for sustaining" petitioner's conviction. *State v. Hubbard, supra* at 142. It held that statements obtained in violation of *Miranda* can be admitted as *substantive* evidence to rebut testimony given by *any* defense witness. *Hubbard,* at 143–44. Approval of this novel approach would eviscerate the strong Fifth Amendment procedural safeguards established over the past 20 years.

■ Last term, the *Miranda* rule suffered its first exception when the Court ruled that the familiar warnings do not have to be administered before the suspect is asked questions prompted by a concern for public safety. *New York v. Quarles, __ U.S. __, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984). On the other hand, *Miranda* application was extended to misdemeanor arrests, although the Court in that case said that *Miranda* is not implicated by roadside questioning of a motorist detained pursuant to a routine traffic stop. *Berkemer v. McCarty, __ U.S. __, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984).

In *Quarles,* Justice Rehnquist characterized the public safety exception as an objective standard. He predicted, "[t]he exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. . . . [P]olice officers can and

will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *New York v. Quarles,* 104 S. Ct. at 2633. Justice O'Connor dissented from the majority analysis in light of the strength and clarity of the *Miranda* rule. "Were the Court writing from a clean slate, I could agree with its holding. But *Miranda* is now the law", she emphasized, "and, in my view, the Court has not provided sufficient justification for departing from it or for blurring its now clear strictures." *New York v. Quarles,* 104 S. Ct. at 2634 (O'Connor, J., concurring in part in the judgment and dissenting in part).

A few weeks later, in *Berkemer v. McCarty, supra,* the Court again reaffirmed the principle that "if the police take a suspect into custody and then ask him questions without informing him of [his] rights . . ., his responses *cannot* be introduced into evidence to establish his guilt." (Italics ours.) *Berkemer,* 104 S. Ct. at 3145.

The pretrial judge's ruling allowed admission of the defendant's statements only as permitted by *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). In *Harris,* the Court permitted impeachment of *the defendant* through use of the defendant's incriminating statements obtained in violation of *Miranda. Accord, Riddell v. Rhay,* 79 Wn.2d 248, 484 P.2d 907, *cert. denied,* 404 U.S. 974 (1971).[1] In evidentiary terms, *Harris* allows impeachment by use of prior inconsistent statements, through which a defendant's credibility is attacked, by introducing a prior statement inconsistent with the defendant's in–court testimony. *See* ER 613. The Court of Appeals would allow the substance of any witness' in–court testimony to be contra-

---

[1]Three states have refused to adopt *Harris* following analysis under their respective state constitutions. *People v. Disbrow,* 16 Cal. 3d 101, 113, 545 P.2d 272, 280, 127 Cal. Rptr. 360, 368 (1976) (relying on Cal. Const. art. 1, § 15); *State v. Santiago,* 53 Hawaii 254, 265–66, 492 P.2d 657, 664 (1971) (relying on Hawaii Const. art. 1, § 8); *Commonwealth v. Triplett,* 462 Pa. 244, 249, 341 A.2d 62, 64 (1975) (relying on Pa. Const. art. 1, § 9).

dicted by illegally obtained statements of the defendant. This impeachment by contradiction actually constitutes rebuttal evidence. It falls within no exception to the hearsay rule. *Jacqueline's Wash., Inc. v. Mercantile Stores Co.,* 80 Wn.2d 784, 788, 498 P.2d 870 (1972); *Anderson v. Dobro,* 63 Wn.2d 923, 389 P.2d 885 (1964). To be admissible, such extrinsic evidence must be independently competent and must be admissible for a purpose other than that of attacking the credibility of the witness. *Jacqueline's,* at 789.

The jury in *Harris* was specifically instructed that it could consider the defendant's prior inconsistent statements "only in passing on [his] credibility and not as evidence of guilt." *Harris,* at 223; *Berkemer v. McCarty,* 104 S. Ct. at 3145 n.9. In upholding this limited use of the defendant's statements, the Court noted that the prosecution had done "no more than utilize the traditional truth-testing devices of the adversary process": confronting a witness with his own "prior inconsistent utterances." *Harris,* at 225, 226.

Since *Harris,* the Supreme Court has been careful to state its holding as applicable only under the circumstances present in that case. In *Oregon v. Hass,* 420 U.S. 714, 723, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975), the Court noted that excluding the defendant's statement "would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence *from [his] own mouth.*" (Italics ours.) The Court described *Harris* similarly in *United States v. Havens,* 446 U.S. 620, 626–27, 64 L. Ed. 2d 559, 100 S. Ct. 1912 (1980). The *Havens* Court felt, however, that the government should not be precluded from using a defendant's prior inconsistent statements to impeach the defendant's own testimony elicited during cross examination. The "incremental" deterrent effect of such a bar was thought to be outweighed by the need to discourage perjury. *Havens,* 446 U.S. at 627. The *Havens* decision to apply the *Harris* exception to a defendant's cross examination testimony is as far as the Court has gone.

As the dissent below stated, "the majority's intention in

*Harris* was to open the door but a crack to permit the utilization of the inadmissible statements in the narrow context of impeaching the credibility of a testifying defendant." *State v. Hubbard, supra* at 155 (Ringold, J., dissenting). Affirmance of the Court of Appeals would rip the door from its hinges.

The District of Columbia Circuit Court recently rejected the rule adopted by the Court of Appeals below. The defendant in *United States v. Hinckley,* 672 F.2d 115 (D.C. Cir. 1982) was arrested shortly after shooting the President and three other persons. FBI agents questioned him, in violation of *Miranda,* and obtained statements potentially useful to rebut an anticipated insanity defense. The government argued that, even if the statements could not be used in its "case–in–chief," they should nevertheless be admissible "in rebuttal," to counter whatever psychiatric evidence the defendant might present.

The court rejected a "testimony–by–proxy" theory the government advanced to counter the expert psychiatric witnesses put on by the defense. Instead it restricted the *Harris* rule to impeachment of the defendant only.

> Although it is indeed true that if a defendant takes the stand and testifies in a manner contradicted by illegally obtained evidence, that evidence can be used for the limited purpose of impeachment, there is as yet no basis in law for converting this limited exception into a general license to use illegally obtained evidence for rebuttal purposes. And if there were, the government does not adequately explain why it would single out the insanity defense for application of the testimony–by–proxy theory. All defense testimony is in a sense testimony by proxy, yet the government concedes that it would not seek to apply its rebuttal theory to an alibi or other affirmative defenses. We can find no reason for such a distinction.

(Footnotes omitted.) *Hinckley,* at 134.[2]

---

[2]Here, the State seeks to employ illegally obtained statements to rebut not an insanity defense, but alibi testimony. The prosecution in *Hinckley* conceded it would not attempt to use the statements for an alibi defense.

If the Division One holding were here accepted, statements obtained in violation of *Miranda* could become tantamount to guilty pleas. The defendant could not call any witnesses without opening the door, on rebuttal, to the admission of his pretrial statements. Such a rule would tell the police that they may freely interrogate an accused incommunicado and without counsel and know that statements they obtain may be used if the defendant offers witnesses in his behalf. Because such a result would effectively eliminate the constitutional guaranties embodied in the Fifth Amendment, we reverse and remand for a new trial.

WILLIAMS, C.J., BRACHTENBACH, DORE, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

ANDERSEN, J. (dissenting)—I see nothing in either the state or federal constitutions which requires that an accused be permitted to work a fraud upon the court and jury. The trial court by its ruling in this case made clear that it would not countenance such a result. The Court of Appeals agreed. I also agree and would affirm the defendant's conviction of first degree murder.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself".[3] To protect this right, the United States Supreme Court held in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966) that the prosecution was barred from proving its case by using statements made by a defendant while in custody prior to having counsel or effectively waiving the right to counsel. The procedural safeguards established by the *Miranda* Court were not, however, intended to "create a constitutional straitjacket", *Miranda* at 467, nor are the *Miranda* warnings themselves rights protected by the constitution. *New York v. Quarles,* ___ U.S. ___, 81 L. Ed. 2d 550, 556, 104 S. Ct. 2626, 2631 (1984) (citing *Michigan v.*

---

[3]Fifth amendment to the United States Constitution.

*Tucker,* 417 U.S. 433, 444, 41 L. Ed. 2d 182, 94 S. Ct. 2357, 2364 (1974)).

Soon after *Miranda,* the United States Supreme Court further made it clear that

[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

*Harris v. New York,* 401 U.S. 222, 224, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). The court in *Harris,* relying on *Walder v. United States,* 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354 (1954), thereupon held that a statement made by a defendant that is constitutionally inadmissible as a part of the State's case in chief could nevertheless be used for impeachment purposes because

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, . . .

*Harris,* at 226.

In *State v. Hayes,* 73 Wn.2d 568, 439 P.2d 978 (1968), also relying on *Walder,* this court allowed the use of evidence suppressed by a pretrial order where the defendant opened the door to its admissibility by seeking to gain extraordinary advantage from the fact of suppression of that evidence. In *Hayes,* the defendant on direct examination of a witness other than himself attempted to establish his intoxication defense. The trial court's pretrial order had suppressed the Breathalyzer test results which showed that his blood alcohol was below the intoxication level at the time of the crime for which he was being tried. This court allowed the State to use the previously suppressed evidence because the defendant had himself opened up the subject of the degree of his intoxication, the court stating:

It is one thing to say the state cannot make affirmative use of evidence which has been suppressed by pretrial order. It is quite another to say that appellant can turn the pretrial order into a shield against contradiction.

*Hayes,* at 571.

I see no valid distinction to be made between the application of the principles of *Walder, Harris, Hayes* and their progeny[4] to those cases, and their application to the case before us. The alibi testimony by the defendant's girl friend was given only after she knew the defendant's statement to his parole officer (that he was present at the murder scene) had been ruled inadmissible for use in the State's case in chief, and after she also knew that the defendant would not take the stand and be subject to impeachment by the use of his statement.

The defendant's statements which are here in question were made after the defendant was fully informed by the police of his rights and which he declined to waive. They were made to his parole officer with whom he had requested to speak. They were made freely, voluntarily, and apparently without the belief that they would be kept in confidence. The parole officer had previously explained to the defendant that what he told her would not be kept confidential—and it was only after she again told him on this occasion that she could not promise confidentiality that the defendant then refused to give more specific details of the murder. Under these circumstances, the trustworthiness of the statements satisfies legal standards against which admissibility may be measured.

It is to be kept in mind here that the alibi witness who testified at trial that the defendant was home with her at the time of the murder was far from a disinterested and unbiased witness. This witness, who married the defendant in jail after his conviction (and which they somehow managed over the State's objection and without the court's permission), was actively involved in the preparation of the defense case. The use of this witness, now the defendant's wife, to establish his alibi defense was but a thinly veiled

---

[4]*United States v. Havens,* 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912 (1980); *Oregon v. Hass,* 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975); *Michigan v. Tucker,* 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974). *See also United States v. Calandra,* 414 U.S. 338, 38 L. Ed. 2d 561, 94 S. Ct. 613 (1974); *State v. Holland,* 98 Wn.2d 507, 519–20, 656 P.2d 1056 (1983).

attempt to do indirectly what the defendant himself could not do directly—establish an alibi and at the same time keep his own freely, voluntarily and openly given statement from the jury.[5] To my view, the trial court acted appropriately when it refused to permit this and ruled that under these circumstances the defendant's prior statement that he was present at the scene when the murder was committed would be admissible for the narrow purpose of contradicting the alibi.

I would not countenance allowing alibi testimony of this nature to go uncontradicted by the defendant's own words. In my judgment, to do this permits the prohibitions of *Miranda* to be used to impair the integrity of the truth–finding process without correspondingly furthering the protection of the defendant's right against self–incrimination. Nothing in either the state or federal constitutions or in any of the United States Supreme Court's decisions mandates such a result. Nor would I. A defendant should not be permitted to use the constitution to perpetrate a fraud on the trial court and the jury. I would affirm the conviction.

DOLLIVER and DIMMICK, JJ., concur with ANDERSEN, J.

---

[5]*See, e.g., St. Regis Paper Co. v. United States,* 368 U.S. 208, 217, 7 L. Ed. 2d 240, 82 S. Ct. 289 (1961); *United States v. Brandom,* 479 F.2d 830, 835 (8th Cir. 1973); *FTC v. Dilger,* 276 F.2d 739, 743 (7th Cir. 1960); *McCubbin v. State,* 675 P.2d 461, 465 (Okla. Crim. App. 1984).