THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DARRYL JAMES, Appellee.

*Opinion filed July 20, 1988.—Rehearing denied October 3, 1988.*

524

WARD, J., joined by STAMOS, J., dissenting.
CLARK, J., joined by STAMOS, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, and Thomas V. Gainer, Jr., and Sharon Johnson Coleman, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

Steven Clark and Michael J. Pelletier, Deputy Defenders, and Karen Michels and Martin Carlson, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Darryl James, was convicted by a jury in the circuit court of Cook County of the murder of Gerilia Boyd and the attempted murder of Delbert Collins. The court sentenced the defendant to concurrent terms of 30 years for murder and 15 years for attempted murder. The appellate court reversed the convictions (153 Ill. App. 3d 131), and we granted the State's petition for leave to appeal (107 Ill. 2d R. 315).

The issues presented in this appeal all relate to the State's use of evidence, obtained in violation of the defendant's fourth amendment rights, to rebut the testimony of a defense witness other than the defendant.

The record in this case reveals that on August 30, 1982, at approximately 11 p.m., a group of eight boys was proceeding home from a party at the Ida B. Wells housing project in Chicago. Three other boys approached the group and demanded money. When no money was surrendered, one member of the trio produced a gun and began shooting at the larger group. Gerilia Boyd was wounded and died as a result of the shooting. Delbert Collins, who was shot in the back, testified on behalf of the State at the defendant's trial.

Upon arriving at the scene of the shooting, the police questioned several eyewitnesses who volunteered information regarding the incident. Five of the eyewitnesses, including Delbert Collins, were members of a group called the "B Boys." The five State witnesses described two of the offenders as being 6 feet 1 inch tall and the third offender as being about 5 feet 4 inches tall. They told the police that all three were wearing ski jackets and baseball caps. The shortest of the three offenders fired the gun. One of the eyewitnesses gave the police the name of a person he thought was one of the offenders. Police arrested this suspect and questioned him, but later released him when the same witness said this person was not involved in the shooting. The record reveals that the arrested suspect told the police that two youths by the names of "Carey" and "Guam" were involved in the incident and that "Carey" was the shooter. "Carey" was also brought into the station, but was subsequently released when the eyewitness told police that "Carey" was also not one of the offenders.

The "B Boys" testified for the State at trial and all made in-court identifications of the defendant, who was taken into police custody on August 31, the day after the shooting. The police had found the defendant at his mother's beauty shop sitting under the hair dryer.

Each of the "B Boys" testified that the person responsible for the shooting had "reddish" hair, which he wore shoulder length in a slicked-back "butter" style, and also wore an earring. When giving descriptions of the offenders to the police immediately following the incident, none of the eyewitnesses said anything about the hair color or hairstyle of the person who shot the victim. One witness did testify that he told a detective at the police station that the person responsible for the shooting had red hair and a light "reddish" complexion. Each of the witnesses recalled having seen the defendant a few weeks prior to

the shooting at the Bud Billiken Parade. They remembered the defendant because of his red "butter" hairstyle and the earring in his left ear. At trial, the defendant's hair was black and he was wearing it in a "natural" style. He was not wearing an earring. Despite the discrepancy between the description given by the eyewitnesses immediately after the incident occurred and the defendant's physical appearance at trial, the "B Boys" stood firm in their identification of the defendant as the one who committed the shooting.

The defendant's principal witness at trial was Jewel Henderson, a friend of the defendant's family. She testified that on the day of the shooting she had taken the defendant to register for high school, and at that time the defendant's hair was black. To "impeach" and rebut Henderson's testimony, the State sought to introduce a previously suppressed statement of the defendant. Following a hearing on the voluntariness of the defendant's suppressed statement, the trial court, over the defendant's objection, permitted the State to introduce the statement.

The suppressed statement which the trial court admitted into evidence revealed that while in police custody on August 31, the defendant told the police that on the evening of August 30, his hair was long and combed back straight and "reddish" in color. He said that he had gone to his mother's beauty parlor on August 31 to have his hair dyed and curled to change his appearance. The trial court had suppressed this statement at a pretrial hearing after finding that there was no probable cause to arrest the defendant, and thus, that the statement was the fruit of an unlawful arrest.

Following the police officer's testimony regarding the defendant's suppressed statement, at the request of defendant, the trial court orally instructed the jury that the testimony was "offered for the purpose of impeaching the testimony of Miss Henderson who stated to you

that the defendant's hair was black. This evidence is offered to refute and rebut that testimony, that it was not black but it was red at the point the officer said the defendant told him it was red." The defendant made no objection to this instruction and suggested no change in it or any further instruction. At the close of the evidence, however, the trial court refused the defendant's proffered jury instruction explaining that the defendant's statement could be considered only for purposes of determining the believability of the witness and could not be used as substantive evidence of the defendant's guilt or innocence. These refused instructions and the instructions given relating to this issue will be discussed later.

The record further reveals that during rebuttal closing argument, the prosecutor stated, "[T]his case comes to you with five eyewitnesses, an admission that he changed his color—changed the color of his hair." Defense counsel's objection to this reference to the defendant's suppressed statement was overruled.

Defendant did not testify at trial. As noted previously, the jury found the defendant guilty of murder and attempted murder and the trial court sentenced the defendant on both counts.

Defendant appealed his convictions to the appellate court, arguing that his fourth amendment rights were violated when the trial court admitted the defendant's previously suppressed statement to impeach the testimony of defense witness Henderson. The appellate court reversed the defendant's convictions and ordered a new trial, finding that the admission of the defendant's suppressed statement was improper. The appellate court also rejected the State's alternative argument that even if the trial court did err in admitting the defendant's suppressed statement, the error was harmless in light of the overwhelming evidence of the defendant's guilt. 153 Ill. App. 3d 131.

In its appeal before this court, the State maintains that the appellate court's reversal of the defendant's convictions was erroneous. Citing *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912, *People v. Payne* (1983), 98 Ill. 2d 45, and *People v. Finkey* (1982), 105 Ill. App. 3d 230, the State contends that the trial court properly admitted the defendant's suppressed statements to impeach and rebut Henderson's testimony. The State again argues, in the alternative, that even if the trial court did err in admitting the defendant's suppressed statements, that error is harmless in light of the overwhelming evidence of the defendant's guilt.

It is, of course, the general rule that evidence obtained in violation of the fourth amendment may not be introduced into evidence at trial. (*Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684; *Weeks v. United States* (1914), 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341.) However, while the exclusionary rule may have begun as an absolute bar on the use of such evidence (see *Agnello v. United States* (1925), 269 U.S. 20, 70 L. Ed. 145, 46 S. Ct. 4; *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182), over the years a number of narrow exceptions to the rule have evolved.

One such exception applicable to the facts of this case has its origin in *Walder v. United States* (1954), 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354. The defendant in *Walder* was charged with four narcotics-related transactions. He had previously been indicted for purchase and possession of heroin, but those charges were dismissed after a motion to suppress illegally obtained evidence was granted. 347 U.S. at 63, 98 L. Ed. at 506, 74 S. Ct. at 355.

The prosecutor's case consisted principally of the testimony of two government informers who had allegedly purchased drugs from Walder. Walder's defense consisted solely of his own testimony, during which he de-

nied any narcotics dealings with the informers. Early in his direct examination, Walder testified as follows:

" 'Q. Now, first, Mr. Walder, before we go further in your testimony, I want to you [*sic*] tell the Court and jury whether, not referring to these informers in this case, but whether you have ever sold any narcotics to anyone.

A. I have never sold any narcotics to anyone in my life.

Q. Have you ever had any narcotics in your possession, other than what may have been given to you by a physician for an ailment?

A. No.

Q. Now, I will ask you one more thing. Have you ever handed or given any narcotics to anyone as a gift or in any other manner without the receipt of any money or any other compensation?

A. I have not.

Q. Have you ever even acted as, say, have you acted as a conduit for the purpose of handling what you knew to be a narcotic from one person to another?

A. No, sir.' "

347 U.S. at 63, 98 L. Ed. at 506, 74 S. Ct. at 355.

On cross-examination, in response to questioning about this direct testimony, Walder reiterated his assertion that he had never purchased, sold or possessed any narcotics. Over objection, the prosecution then questioned him about his previous drug arrest, and about the heroin which had been unlawfully seized. Walder denied that any drugs had been taken from him at that time. Thereafter the prosecution introduced evidence of the prior search and seizure of the heroin. The trial court admitted this evidence, instructing the jury that it was to be used solely for the purpose of impeaching the defendant's credibility.

The Supreme Court upheld the admission of the evidence. In so doing, it acknowledged the general rule that the government may not use the fruits of an illegal search to secure a conviction. However, the Court went

on to explain the rationale for the exception it was creating as follows:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." 347 U.S. at 65, 98 L. Ed. at 507, 74 S. Ct. at 356.

This so-called "impeachment exception" to the exclusionary rule was expanded in *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643. In that case, a prosecution for unlawful sale of heroin, the defendant's post-arrest inculpatory statements had been suppressed because they were obtained in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The defendant testified, and on direct examination admitted making a sale of the contents of a glassine bag to an undercover officer, but asserted that the substance was baking power. That testimony contradicted the defendant's post-arrest statements. *Harris*, 401 U.S. at 223, 28 L. Ed. 2d at 3, 91 S. Ct. at 644.

On cross-examination, the defendant was asked about those inconsistent statements, and he testified that he could not remember virtually any of the questions or answers recited by the prosecutor. The jury was subsequently instructed that the statements attributed to the defendant by the prosecution could only be considered in assessing the defendant's credibility and not as evidence of guilt.

The Supreme Court, quoting *Walder*, held that this use of the otherwise inadmissible evidence was proper. The Court also expanded the *Walder* rule in a significant respect, stating:

> "It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder*. Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (401 U.S. at 225, 28 L. Ed. 2d at 4, 91 S. Ct. at 645.)

See also *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215.

These principles were reiterated, and the rule was further expanded in *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912. In that case, Havens and a companion, John McLeroth, were ar-

rested after airport customs officers found cocaine sewed into makeshift pockets in a T-shirt McLeroth was wearing. A warrantless search of Havens' luggage produced a T-shirt from which pieces had been cut that matched the pockets in McLeroth's T-shirt. The fruits of the search of Havens' luggage, including the cut-up T-shirt, were suppressed prior to trial. 446 U.S. at 621-22, 64 L. Ed. 2d at 562, 100 S. Ct. at 1914.

McLeroth pleaded guilty and testified against Havens. His testimony included an assertion that Havens had supplied him with the altered T-shirt and had sewn the pockets shut. Havens took the stand in his own defense and, on direct examination, denied involvement in the offense and also denied knowing that McLeroth had anything "taped or draped around his body." 446 U.S. at 622, 64 L. Ed. 2d at 563, 100 S. Ct. at 1914.

On cross-examination, Havens was questioned specifically about his involvement in "sewing of the cotton swatches to make pockets on [the] tee shirt." (446 U.S. at 623, 64 L. Ed. 2d at 563, 100 S. Ct. at 1914.) He again denied involvement. He was then asked whether when he came through customs he had the suppressed T-shirt in his luggage. After defense counsel's objection was overruled, Havens denied possession of the T-shirt. Subsequently, on rebuttal, a government agent testified that the T-shirt had been found in Havens' luggage, and the T-shirt was admitted into evidence. The jury was instructed that this rebuttal evidence was to be considered only for impeaching Havens' credibility. 446 U.S. at 623, 64 L. Ed. 2d at 563, 100 S. Ct. at 1914.

The Supreme Court upheld this use of the evidence. In so doing, it enlarged the impeachment exception in an important respect. In prior cases such as *Walder* and *Harris*, the statements sought to be impeached were elicited on direct examination. In *Havens*, the specific "T-shirt testimony" which was impeached by admission

of the illegally seized evidence was brought out on cross-examination by the government. This fact, while not directly applicable to the case before us, nonetheless indicates the Court's increasing unwillingness to condone the misuse of the exclusionary rule as a shield for purposeful perjury. The Court stated:

"We also think that the policies of the exclusionary rule no more bar impeachment here than they did in *Walder*, *Harris*, and *Hass*. In those cases, the ends of the exclusionary rules were thought adequately implemented by denying the government the use of the challenged evidence to make out its case in chief. The incremental furthering of those ends by forbidding impeachment of the defendant who testifies was deemed insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial. We reaffirm this assessment of the competing interests, and hold that a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." 446 U.S. at 627-28, 64 L. Ed. 2d at 566, 100 S. Ct. at 1916-17.

The principles emerging from this line of cases were recently applied by this court in *People v. Payne* (1983), 98 Ill. 2d 45. There, the fruits of a search of the defendant's apartment had been suppressed. During cross-examination of one of the arresting officers, the defense counsel asked whether the defendant's apartment had been searched. After the officer responded affirmatively, defense counsel concluded his questioning, thus leaving the jury with the false impression that the search had been fruitless. The trial court permitted the introduction of the suppressed evidence to correct this impression on

the ground that the defense's misleading cross-examination opened the door to its admission. 98 Ill. 2d at 49-50.

This court upheld that ruling, stating, " '[i]f a defendant procures, invites or acquiesces in the admission of evidence, even though it be improper, he cannot complain.' " (98 Ill. 2d at 50, quoting *People v. Burage* (1961), 23 Ill. 2d 280, 283, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.) This court went on to state:

> " 'There is no gainsaying that arriving at the truth is a fundamental goal of our legal system' (*United States v. Havens* (1980), 446 U.S. 620, 626, 64 L. Ed. 2d 559, 565, 100 S. Ct. 1912, 1916), and we consider that allowing the defense or prosecution to misrepresent to the jury the actual facts of the case is neither consistent with the proper functioning and continued integrity of the judicial system nor with the policies of the exclusionary rules. (See *Havens*; *Walder v. United States* (1954), 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354.)" 98 Ill. 2d at 51-52.

As the above discussion demonstrates, both the Supreme Court precedent and our own prior cases exhibit strong disapproval of these attempts to abuse the exclusionary rule. The laudable purposes of the rule notwithstanding, it does not follow that defendants may transform it into a shield for knowing perjury or intentional misrepresentation.

The defendant argues, however, that *Walder, Harris, Hass* and *Havens* are distinguishable from this case in one decisive respect: in all those cases the defendant himself testified, and it was his own testimony which was impeached by admission of the previously suppressed evidence. According to this view, when a defendant elects to take the stand and testify in a manner inconsistent with suppressed evidence, he thereby "waives" his right to have the impeaching material excluded. Thus, the argument runs, if the defendant does not testify no such "waiver" occurs and the evidence

must remain excluded, even if other defense witnesses testify falsely.

We do not accept these contentions. While it is true as a factual matter that the defendants in *Walder, Harris* and *Havens* all testified and were themselves impeached, even a cursory reading of those cases reveals that they do not turn on a "waiver" theory, although the waiver theory has been advanced as one explanation for the developing limitations on the exclusionary rule. (See 4 W. La-Fave, Search & Seizure, at 488 (2d ed. 1987).) Rather, the animating principle behind all those cases was a balancing between the goals of the exclusionary rule and the importance of arriving at the truth in criminal trials. In striking that balance, the Court "rejected the notion that the defendant's constitutional shield against having illegally seized evidence used against him could be 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' " *Havens*, 446 U.S. at 626, 64 L. Ed. 2d at 565, 100 S. Ct. at 1916, quoting *Harris*, 401 U.S. at 226, 28 L. Ed. 2d at 5, 91 S. Ct. at 646.

In our view, if a defendant is prohibited from using perjury by way of a defense, it matters not from whose lips that perjury comes. Just as a defendant may not directly perjure himself and then hide behind the exclusionary rule, he also cannot be allowed to use perjurious testimony through a biased defense witness, in this case the principal defense witness, without affording the prosecution an opportunity to challenge the veracity of that testimony. We therefore conclude that admission of the evidence was not inconsistent with the reasoning of the cases discussed above.

Defendant further argues that expansion of admissibility in this manner would seriously erode the protections of the exclusionary rule. He asserts that such a holding will enable police and prosecutors to willfully dis-

regard constitutional rights when obtaining evidence in the knowledge that such evidence will be admissible to contradict defense witnesses. We do not agree with this contention. If this exception to the exclusionary rule is limited to the use of the suppressed evidence to rebut statements made by a defense witness on direct examination and not to rebut statements elicited on cross-examination, there is little likelihood that the police would plan to disregard constitutional rights to obtain a statement from the defendant on the slight chance that a witness for the defense would commit perjury on direct examination. See 4 W. LaFave, Search & Seizure, at 488 (2d ed. 1987).

The argument that the floodgates will be opened to admission of illegally seized evidence in countless cases assumes that defense witnesses commonly resort to perjury. We point out that this case defines a very narrow area in which the exception to the exclusionary rule may operate. The statement of the witness sought to be rebutted by the suppressed evidence must not be elicited through cross-examination by the prosecutor, but must be an assertion by a defense witness elicited on direct examination which is directly contrary to an assertion made by the defendant in the suppressed statements. The difference between the assertion by the defense witness and that contained in the suppressed statement must be more than a mere inconsistency. The difference must amount to a contradiction to the extent that the statement of the witnesses cannot be true when measured against the suppressed statement of the defendant. Also, it must be apparent that the untrue statement of the witness, as so measured, has been purposely presented by the defendant. Furthermore, any part of a suppressed statement of the defendant which can be characterized as a confession must not be used for the purpose of rebutting the testimony of a defense witness. The holding in *Walder* that

the defendant must be free to deny all of the elements of the case against him without thereby giving leave to the government to introduce, by way of rebuttal, illegal evidence secured by it must be scrupulously observed in applying the rule we announce today.

In our view, this rule strikes the proper balance between the right of defendants to be protected against unconstitutional searches and seizures, and the fact-finding goals of criminal trials. The deterrent ends of the exclusionary rule are served by denying the prosecution the use of the evidence in making its case in chief. So long as the defendant and his witnesses testify truthfully and refrain from testifying in a manner inconsistent with that evidence, the defendant retains the benefits of suppression. However, just as the prosecution may not make its case with suppressed evidence neither can the defendant affirmatively exploit the fact of suppression in fashioning his defense.

To summarize, we hold that when a defense witness testifies on direct examination in a manner squarely at odds with evidence which has been suppressed, that evidence may be introduced to challenge the veracity of the testimony. That said, we emphasize that this rule should be carefully applied to avoid enlargement of the exception to the point of swallowing the exclusionary rule. As previously noted, only statements made on *direct* examination may be impeached and there must be a direct, material relationship between the trial testimony and the impeaching evidence. We recognize that the term "impeach" is loosely used in this context. Although the use of prior inconsistent statements for impeachment is ordinarily considered in connection with prior statements by the witness sought to be impeached, impeachment may also be accomplished by the use of a prior contradictory statement by another. Although such contradictory statements by others are often held inadmissible as being ir-

relevant as collateral to the main proceeding, such a contradictory statement of another may be used to prove untrue some fact recited by a witness as true which, if he were really there and saw what he claims to have seen, he could not have been mistaken. "So we may recognize this *** type of allowable contradiction, namely, the contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true." McCormick, Evidence §47, at 99 (2d ed. 1972).

The defendant's next contention is that even if the suppressed statement were properly admitted, error resulted when the trial court refused a limiting instruction proposed by the defendant, and when the prosecution was permitted to argue the evidence "substantively" against the defendant. We hold, however, that any error in this regard was harmless.

After the defendant's suppressed statements were introduced into evidence, defense counsel requested that the jury be given a limiting instruction regarding the use of the statements. The trial judge, at that time, instructed the jury as follows:

"It's offered for the purpose of impeaching the testimony of Miss Henderson who stated to you that the defendant's hair was black. This evidence is offered to refute and rebut that testimony, that it was not black but it was red at the point the officer said the defendant told him it was red."

Defense counsel did not object to this instruction and did not ask that it be altered in any way.

Subsequently, during the conference on instructions, defense counsel proposed the following instruction:

"Evidence that the defendant made statements following his arrest may be considered by you only as it

may affect the believability of Jewel Henderson. It may not be considered by you as evidence of the commission of any of the crimes charged."

Later, the defendant offered a modified version of this instruction in which the word "witnesses" was substituted for the name "Jewel Henderson." The trial court refused to give either version, but did give the following pattern instruction:

"The believability of a witness may be challenged by evidence that on some former occasion the witness made a statement that was not consistent with his testimony in this case and evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom." Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981).

The instruction given does not fit the situation in this case, because the instruction refers to a prior statement by a witness which contradicts the evidence given by that witness at trial. It does, however, state the purpose for which such contradicting evidence may be used and specifies that the prior contradicting statement may be considered only for the purpose of deciding the weight to be given to the testimony given in court. In considering whether the court committed reversible error in refusing the two instructions tendered by the defendant, we must consider not only the pattern instruction on inconsistent statements, which the court gave, but also the oral instruction given by the court following the introduction of the evidence in question, which informed the jury that this evidence was to be considered for impeachment purposes. We find that the jury was informed of the limited use of this evidence. Any error or irregularity in the oral instruction given following the introduction of the evidence was waived by the defendant's failure to object or to request further instruction.

During rebuttal argument, the prosecution made the following statement:

> "This case comes to you with five eyewitnesses, and admission that he changed his color—changed the color of his hair."

An objection to this statement was overruled. The defendant now argues that this statement amounts to "substantive" use of the evidence in violation of the limited purpose for which it was admitted.

We disagree. Control of closing argument is largely left to the discretion of the trial court and every presumption must be indulged in that the court has properly exercised that discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172.) Moreover, the reference to the defendant's statement was made on rebuttal argument, after defense counsel had argued as to the reasons Jewel Henderson would not lie for defendant. In that context, the reference was relevant to the issue of Ms. Henderson's truthfulness and was not a wholly unwarranted line of argument. Moreover, the statement quoted was little more than a passing reference. The defendant's statement was not dwelled upon or made the focus of the argument. The jury was instructed as to the purpose for which defendant's statement could be used. In light of the other strong evidence of defendant's guilt, we hold that any error resulting from this brief reference was harmless.

For all the above reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE WARD, dissenting:

The reason for the majority's holding is seductively presented: to prevent an accused from manipulating the exclusionary rule in such a way as to permit the use of

perjury in his defense. I consider that an invincible problem with the holding, however, is that it permits the impeachment of a witness' credibility on the ground of an inconsistent statement, not made by the witness himself, but by another person and, further, that the impeaching would be by means of illegally procured evidence that had been suppressed in the very case. Justice Clark in his dissent cites decisions that hold such evidence cannot be used to impeach the testimony of anyone other than the defendant upon whose motion the evidence was suppressed. This is only sensible; to hold otherwise would be to contradict the nature of impeachment. McCormick, Evidence §33 (3d ed. 1984).

Too, the trial court compounded its error of permitting impeachment of the witness by the suppressed statement of the defendant. The judge instructed the jury at that time:

"It's offered for the purpose of impeaching [*sic*] the testimony of Miss Henderson who stated to you that the defendant's hair was black. This evidence is offered to refute and rebut that testimony, that it was not black but it was red at the point the officer said the defendant told him it was red."

The jury thus was told that the suppressed evidence was being admitted and being used as substantive evidence to contradict the testimony of the witness. Deeper confusion resulted when the trial court formally gave Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981), which is set out in the majority opinion. Considering what had occurred the instruction was irrelevant. It did not, as the majority opinion states, "fit the situation in this case." 123 Ill. 2d at 540.

The trial court continued to confuse impeachment with rebuttal and, as the appellate court opinion noted, permitted the prosecution in final argument to make use of suppressed evidence substantively in rebuttal. (McCor-

mick, Evidence §33 (3d ed. 1984).) The majority responds to the complaint that the court permitted this use of the suppressed evidence by commenting that control of closing argument is within the discretion of the trial court and that it will be presumed that the discretion was properly exercised. As an abstract proposition, that is undeniable, but it is obvious that it does not answer the complaint that the suppressed evidence was used in rebuttal. We cannot innocently indulge the presumption that the court properly exercised discretion when the record shows error in its exercise. Another aspect of the majority's view with which I cannot agree is that it appears to gratuitously assume that a witness' testimony will be perjurious or at least erroneous. To illustrate, the opinion contains statements such as: "Also, it must be apparent that the untrue statement of the witness ***" (123 Ill. 2d at 537) and "So long as the defendant and his witnesses testify truthfully and refrain from testifying in a manner inconsistent with that evidence, the defendant retains the benefits of suppression" (123 Ill. 2d at 538). The majority does not consider that there simply might be differing impressions or recollections by the defendant and the witness.

For these reasons, I must respectfully dissent.

JUSTICE STAMOS joins in this dissent.

JUSTICE CLARK, also dissenting:

Because I cannot acquiesce in this judicial repeal of the fourth amendment, I strongly and categorically dissent.

The majority reaches out to achieve a result which is at best suggested, and hardly compelled, by the Supreme Court's case law and by our own. In fact, the few cases directly on point, which the majority does not cite or distinguish, clearly hold that suppressed evidence cannot be

admitted to "impeach" or rebut the testimony of any witness other than the defendant himself. (See *United States v. Hinckley* (D.C. Cir. 1982), 672 F.2d 115; *State v. Burnett* (Mo. 1982), 637 S.W.2d 680 (*en banc*); *People v. Walls* (1973), 42 A.D.2d 575, 344 N.Y.S.2d 435; *State v. Kilborn* (1983), 143 Vt. 360, 466 A.2d 1175; *State v. Hubbard* (1985), 103 Wash. 2d 570, 693 P.2d 718; see also 4 W. LaFave, Search & Seizure §11.6(a), at 495-96 (2d ed. 1987).) The majority's contrary decision is, for several reasons, simply mistaken.

First, the majority relies upon a reading of the applicable case law which is, to say the least, extremely tendentious. It is well-settled that under the fourth amendment exclusionary rule evidence obtained in violation of the amendment must be suppressed and may not be introduced at trial. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *Nardone v. United States* (1939), 308 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266; *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182.) In other words, the prosecution may not use illegally obtained evidence as substantive evidence of the defendant's guilt. Nor is this restriction limited to the prosecution's case in chief:

> "[The] Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." (*Walder v. United States* (1954), 347 U.S. 62, 65, 98 L. Ed. 503, 507, 74 S. Ct. 354, 356.)

Any other rule would unduly encourage law enforcement authorities to violate the fourth amendment routinely so as to garner evidence which could be held in reserve,

thereby inhibiting the accused from presenting evidence in his own defense.

There are some situations in which illegally obtained evidence may be used. Outside of the trial context, such evidence may be used, for example, to locate witnesses identified by the evidence (*Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357) or to question witnesses during grand jury proceedings (*United States v. Calandra* (1974), 414 U.S. 338, 38 L. Ed. 2d 561, 94 S. Ct. 613). Under the Federal Constitution, illegally obtained evidence may also be used as substantive evidence of the defendant's guilt so long as it is the product of a facially valid warrant executed by law enforcement authorities acting in good faith. (*United States v. Leon* (1984), 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405.) Of course, none of these exceptions are pertinent to this case. The only two exceptions which might even arguably apply are the use of illegally obtained evidence to either (1) impeach a defendant's credibility either on cross-examination or direct (*United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912; *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215; *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643; 4 W. LaFave, Search & Seizure §11.6(a) (2d ed. 1987); see also *Walder v. United States* (1954), 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354) or to (2) respond to defense tactics which seek to take extraordinary advantage of the fact of suppression and thereby "open the door" to the admission of the suppressed evidence (*Walder v. United States* (1954), 347 U.S. 62, 65, 98 L. Ed. 503, 507, 74 S. Ct. 354, 356; *United States ex rel. Castillo v. Fay* (2d Cir. 1965), 350 F.2d 400; *People v. Payne* (1983), 98 Ill. 2d 45; *Commonwealth v. Wright* (1975), 234 Pa. Super. 83, 339 A.2d 103; 4 W. LaFave, Search & Seizure §11.6(b) (2d ed. 1987)). The majority's opinion confuses

these two distinct exceptions and thereby creates a rationale for the admission of illegally garnered evidence far broader than any actually contained in these cases.

As to the first, or impeachment, exception, the majority ignores the language in the Supreme Court cases clearly limiting it to the defendant who testifies. For example, the *Havens* Court, commenting on its earlier cases of *Harris* and *Hass*, noted:

> "In both cases, the Court stressed the importance of arriving at the truth in criminal trials, as well as the *defendant's* obligation to speak the truth in response to proper questions. We rejected the notion that the *defendant's* constitutional shield against having illegally seized evidence used against him could be 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.'
> \* \* \*
>
> \* \* \* We have repeatedly insisted that when *defendants* testify, they must testify truthfully or suffer the consequences." (Emphasis added.) *Havens*, 446 U.S. at 626, 64 L. Ed. 2d at 565-66, 100 S. Ct. at 1916.

Not a line of *Harris* or *Havens* suggests that their holdings are intended to apply to witnesses other than the defendant.

Moreover, it is clear that both *Harris* and *Havens* are premised at least partially upon a waiver theory utterly inapplicable to witnesses other than the defendant. "Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." (*Harris*, 401 U.S. at 225, 28 L. Ed. 2d at 4, 91 S. Ct. at 645-46.) The interpretation of *Harris* as an example of waiver is not, as the majority seems to suggest, merely a commentator's theory or the defendant's own invention. In *State v. Burnett* (Mo. 1982), 637 S.W.2d 680, the Missouri Supreme Court adopted the same interpretation:

"In each of the United States Supreme Court cases, including *Havens,* the Court recognized that the defendant's right not to have illegally seized evidence used against him, but found a waiver of that right when and if the defendant testified in his own defense in the manner set forth in those cases. It was the defendant who was not to be allowed the benefit of the exclusionary rule so as to permit him to freely commit perjury. This constituted a waiver as to rebuttal evidence directly contradicting the defendant's testimony.

In the instant case, the defendant did not testify and, therefore, cannot be held to have waived his Fourth Amendment rights with respect to the suppressed evidence so as to permit its introduction as impeachment of his direct testimony. There was no testimony of the defendant to impeach."

Waiver, of course, does not apply to a witness who may testify voluntarily or under process, may or may not be telling the truth, and is in any case no mere surrogate for the defendant. We are long past the days when a party was held to "vouch for" his witness and to be bound by what his witness said. Moreover, the majority's contention that Jewel Henderson perjured herself is speculation, unsupported by anything in the record.

A second distinction between this case and the impeachment cases is that those cases involved impeachment, "a traditional truth-testing device of the adversary process," whose value outweighed the benefits of the exclusionary rule in that particular instance. But, as the majority's use of quotation marks around the word "impeachment" suggests, the use of the defendant's statement to rebut Jewel Henderson's testimony is not impeachment as traditionally understood. In usual practice, a witness may be impeached by reference to his *own* prior inconsistent statements. I have yet to hear of a case in which a witness was impeached by the use of *someone else's* prior inconsistent statements. If I testify

to something at trial, the fact that I previously said something else may tend to prove that I am lying. But the fact that someone else has previously said something inconsistent proves nothing at all.

For this reason, the trial court's instruction to the jury that "evidence that the defendant made statements following his arrest may be considered by you only as it may affect the believability of Jewel Henderson" made no sense. Under traditional rules of evidence, the defendant's statement could have come in as a prior inconsistent statement if he testified, or as a party-admission, even if he did not. In the first case it would have constituted impeachment, and in the second case, substantive evidence. But its use to "impeach" the testimony of another witness is wholly unprecedented—and flows solely from the attempt to shoehorn the facts of this case into the narrow confines of *Harris* and *Havens*. It is therefore not surprising that the prosecution, the defense counsel, and the court all stumbled so badly over the question of instructing the jury. The only pattern jury instruction available clearly referred to the witnesses' prior inconsistent statements, not the defendant's.

It is true that a witness may sometimes be impeached by extrinsic facts if the facts are not collateral. Noncollateral facts include "facts relevant to substantive issues in the case," "facts which are independently provable by extrinsic evidence to impeach or disqualify the witness," (*e.g.*, bias, interest, conviction of crime, etc.) and, lastly, ordinarily collateral facts which are so vital to the witnesses' story that proof of them will tend to disprove it: "the contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true." (McCormick, Evidence §47, at 99 (2d ed. 1972).) McCor-

mick nowhere suggests that extrinsic proof as to any of these three types of facts can include the prior contradictory statement of someone other than the witness. None of McCormick's examples of the third type of exception involve statements of another witness: See, *e.g.*, *East Tennessee V. & G. Ry. Co. v. Daniel* (1893), 91 Ga. 768, 18 S.E. 22 (witness who claimed to see incident while stopping to buy tobacco impeached by testimony of storekeeper that he did not stop to buy tobacco); *Stephens v. People* (1859), 19 N.Y. 549, 572 (witness who claimed that arsenic was kept to kill rats in cellar where provisions were kept impeached by witness who testified that no provisions were kept in cellar); *Commonwealth v. Jackson* (Ky. 1955), 281 S.W.2d 891 (impeachment by inconsistent statement of *witness*). I have yet to find a case where a defense witness was impeached by evidence of the defendant's statements.

Of course, the real crux of the matter is the exclusionary rule, not evidence law. But the confusion about impeachment points up the confusion in the majority's opinion. The color of the defendant's hair was not a collateral issue—it was clearly material because it directly related to his identity and his guilt. Therefore the State was free to use extrinsic evidence to prove the color of his hair on the day in question. That is not really the question. The real question is whether the State can use suppressed evidence to prove that extrinsic fact. Normally such evidence could be admitted—both to impeach the witness and as substantive evidence, without any limiting instruction. But *Walder, Harris*, and *Havens* seem to limit the admission of suppressed evidence to impeachment—evidence admitted not as substantive proof of the defendant's guilt, but only as tending to prove that he is not telling the truth. This distinction, while obviously fragile, would be completely destroyed by the majority's decision.

In fact, although the majority's opinion is not clear on this point, admission of the defendant's statement makes sense not as impeachment but as *rebuttal*, substantive evidence introduced to contradict a specific point in the defendant's evidence. In other words, what the majority really means is that a defendant who puts on a defense thereby waives his fourth amendment right to the exclusion of suppressed evidence which contradicts his defense. While I will deal with the merits of this position below—and its impact on the exclusionary rule—I would note here only that it is far removed from the narrow impeachment exception recognized in *Harris* and *Havens*.

The second possible exception to the exclusionary rule, the "opening the door" exception, is also inapplicable. A defendant does not open the door to the admission of suppressed evidence merely by mounting a defense. Instead, he must engage in "tactics which \*\*\* seek to gain extraordinary advantage from the *fact of suppression*." (Emphasis added.) (4 W. LaFave, Search & Seizure §11.6(b), at 497 (2d ed. 1987).) One typical tactic, for example, is to affirmatively assert the nonexistence of the suppressed evidence, or to berate the prosecution for failing to produce it. For example, in our own case of *People v. Payne* (1983), 98 Ill. 2d 45, 49-50, defense counsel, through cross-examination, gave the misleading impression that a search of the defendant's apartment had been fruitless. (See also *Walder v. United States* (1954), 347 U.S. 62, 65, 98 L. Ed. 503, 507, 74 S. Ct. 354, 356 (defendant made sweeping assertion that he had never in his life possessed drugs); *United States ex rel. Castillo v. Fay* (2d Cir. 1965), 350 F.2d 400 (defense counsel gave misleading impression on cross-examination by eliciting response that no narcotics had been found during search; State allowed to rebut with evidence of narcotics paraphernalia); *Commonwealth v. Wright*

(1975), 234 Pa. Super. 83, 339 A.2d 103 (defense counsel created confusion during cross-examination as to whether admitted packet of heroin had ever been chemically analyzed, confusion which could only be alleviated by reference to nine other packets which had been suppressed).) In this case, if defense counsel argued that his client was innocent because he had not while in police custody made any statements, I would have not hesitated to hold that he had "opened the door" to at least a limited admission of the fact that defendant had made certain statements. But if merely presenting a witness whose testimony contradicts suppressed evidence "opens the door" to its admission, then the fourth amendment has only a very limited meaning. This I cannot accept.

Even were the majority's use of the pertinent case law less questionable and more accurate, I would still be deeply troubled by its treatment of, and attitude towards, the fourth amendment exclusionary rule. The rule is not some legal nicety invented to bedevil hapless prosecutors and policemen. It is our only bulwark against the most common and hurtful abuses of governmental power. It expresses the long-held view that:

> "The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement." N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution, at 49 (1937).

After today's decision, a police officer deciding whether to "cross the threshold of the ruined tenement" in violation of the law will know that anything he finds there can be used as substantive evidence of the defendant's guilt so long as the defendant presents any evi-

dence in his own defense. That knowledge can only weaken his incentive to obey the law.

In response, the majority argues that the effect of its decision will not, after all, be very great, since few defendants will actually present "perjured" testimony. Leaving aside the question of how we are to determine whether testimony is in fact perjurious, this argument is premised upon a profound misunderstanding of the purpose of the exclusionary rule. Preventing the admission of reliable evidence which tends to prove the guilt of the defendant is not its ultimate purpose, although that is its immediate effect. The ultimate purpose of the rule is to deter improper police conduct. (*Dunaway v. New York* (1979), 442 U.S. 200, 217-18, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259; *People v. White* (1987), 117 Ill. 2d 194, 226; *People v. Gabbard* (1979), 78 Ill. 2d 88, 98-99.) The principal beneficiaries of the rule's deterrent effect are not the criminals in whose cases the rule is applied but society at large: "all those citizens who never break laws more serious than those prohibiting overtime parking" (Dworkin, *Fact Style Adjudication & the Fourth Amendment: The Limits of Lawyering*, 48 Ind. L.J. 329, 330-31 (1973)) but are nevertheless protected from illegal searches and seizures.

Therefore, the number of defendants who will present perjured testimony and so suffer the admission of illegally obtained rebuttal evidence is simply irrelevant. Law enforcement officials contemplating illegal activity have no way of knowing in advance whether the persons subjected to that activity will eventually attempt to present a defense inconsistent with the evidence the officers may garner, and if so whether their illegally obtained evidence may be useful for rebuttal. Whether the number of admissions is few or many, the knowledge that the evidence may eventually prove useful—either to deter a defendant from presenting inconsistent evidence

or to rebut evidence actually presented—cannot help but influence police behavior.

It is true that this effect will be limited by the inability of the State to use illegally obtained evidence on its case in chief. Where law enforcement authorities know in advance that the only evidence against a potential defendant can only be obtained through unlawful means they may hesitate. But in any case in which the police officers can, through lawful means, acquire enough evidence to make out a case against a suspect, they will be strongly tempted to secure additional evidence illegally.

I would not argue that we will face an epidemic outbreak of police illegality overnight. Our law enforcement authorities have lived with the exclusionary rule for over 60 years. Habit, custom, and residual respect for the law will doubtless prevent any sudden increase in the number of illegal searches and seizures. But eventually the more ambitious and aggressive policemen and prosecutors, engaged as they are in the highly competitive business of ferreting out crime, will discover a handy new tool in their arsenal. I am not so sanguine about human nature as to believe that they will all be scrupulous enough not to use it.

We are all members of a court which adopted the exclusionary rule decades before it was applied to the States. (*People v. Brocamp* (1923), 307 Ill. 448.) With this case we take a significant step towards its weakening and eventual disintegration. Since I cannot agree with this view, I dissent, and would affirm the undivided holding of the appellate court.

JUSTICE STAMOS joins in this dissent.