263 P.3d 1257 (2011)
STATE of Washington, Respondent,
v.
Roe Cruz RAMIREZ-ESTEVEZ, Appellant.
No. 40226-2-II.
Court of Appeals of Washington, Division 2.
October 12, 2011.
*1258 Jesse Cantor, Mazzone and Cantor LLP, Everett, WA, for Appellant.
John C. Skinder, Jon Tunheim, Thurston County Prosecutor's Office, Olympia, WA, for Respondent.

PART PUBLISHED OPINION
HUNT, J.
¶ 1 Roe Cruz Ramirez-Estevez appeals his jury trial conviction of five counts of first degree child rape. He argues that the trial court erred by (1) admitting as an excited utterance the hearsay testimonies of a school counselor and of the victim's aunt that E.O. told them that Ramirez-Estevez raped her, admitting as a prior consistent statement a *1259 digital audio recording of the victim's interview with a detective, and permitting a medical expert to testify that the results of an examination of the victim's genitals were consistent with her medical history; and (2) giving a "to convict" jury instruction violated his constitutional right to be free from multiple punishments from the same act. We affirm.

FACTS

I. CHILD RAPES
¶ 2 Ramirez-Estevez and E.O.'s mother began living together in an apartment in 2002 or early 2003. In 2005, they moved into a trailer with E.O.'s mother's three children, including E.O., who was "[a]bout eight or nine" at the time. 3 Report of Proceedings (RP) at 414. While they lived in the trailer, Ramirez-Estevez raped E.O. multiple times. Ramirez-Estevez stopped raping E.O. before he moved out of the trailer in November 2007.
¶ 3 Two or three years after the rapes occurred, during the 2008-09 school year, E.O. was a sixth grader at an elementary school. School "intervention specialist" Elizabeth Wilcox received "a parent phone call" that prompted her to ask a bilingual Spanish-speaking teacher to speak with E.O. 2 RP at 333. The teacher asked E.O. "if there was anything that [E.O.] had to say that [E.O.] had inside [her]"; in response, E.O. told the teacher about the rapes. 3 RP at 447. The teacher then brought E.O. to Wilcox's office, at which point E.O. "was crying" and appeared "[v]ery upset," "shaky," and "[v]ery nervous." 2 RP at 334. When Wilcox asked E.O. "what she was so upset about," E.O. replied that "her mom's boyfriend who used to stay with them had raped her" "a couple years ago" when she was nine years old. 2 RP at 336-37. Wilcox advised E.O. to "go home and talk to [her] mom, then call [Wilcox] so [Wilcox would] know that [E.O.] had talked to somebody at home." 2 RP at 341-42. Wilcox also contacted Child Protective Services (CPS).
¶ 4 Sometime after speaking with Wilcox, a "shaking" E.O. approached her aunt, began to cry, said that she was feeling scared, and told her aunt that "when [E.O.] was living with [Ramirez-Estevez] he raped her" "more than once." 2 RP at 373-75. E.O. and her aunt called Wilcox and explained "[t]hat [E.O. and her aunt] had the conversation." 2 RP at 342.
¶ 5 After the Thurston County Sheriffs Office received a CPS referral about a possible sexual assault, a "more formal interview" took place in Wilcox's office with Wilcox, E.O., and Thurston County Sheriff's Office Detective Eric Kolb. 2 RP at 345. E.O. again was "shaking" and appeared "upset" and "teary eyed," similar to her demeanor in her first meeting with Wilcox. 2 RP at 346. In a tape-recorded interview, E.O. told Kolb that Ramirez-Estevez had lived with E.O. and her family in the trailer when she was eight or nine and that "[Ramirez-Estevez] grabbed [E.O.] and raped [her]." Clerk's Papers (CP) at 167. E.O. described incidents in which Ramirez-Estevez took off her clothes, locked the doors to her mother's bedroom, and put his "lower front private part" that "he uses to go to the bathroom with" inside E.O.'s "lower front private part" and her "butt." CP at 167-68. Sometimes E.O. "push[ed] him off with [her] leg" and "told him to stop," but "he would get back on." CP at 170. Estimating that there were about "5 to 15" of these episodes, E.O. was "positive" that these encounters happened more than 5 times, but less than 20. CP at 172. After the interview, Kolb referred E.O. to a sexual assault clinic.
¶ 6 E.O. met with Laurie Davis, a nurse practitioner at the sexual assault clinic of Providence St. Peter Hospital. Davis conducted a tape-recorded interview with E.O. in which E.O. described sexual encounters with Ramirez-Estevez that had occurred while they lived at the trailer when E.O. was about eight years old. E.O. told Davis about episodes where Ramirez-Estevez removed his clothes and E.O.'s clothes and penetrated her vagina and anus. E.O. explained that these incidents had happened on more than five occasions. Davis also conducted a physical examination and discovered "divots or notches in [E.O.'s] hymen," which were consistent with E.O.'s description of the rapes. 3 RP at 589.

*1260 II. PROCEDURE
¶ 7 The State charged Ramirez-Estevez with five counts of first degree child rape under RCW 9A.44.073. During trial, E.O. testified that Ramirez-Estevez "[p]ut his private parts onto my private parts" when she was "eight or nine" "[m]ore than five times" but less than "20 or 15" times. 3 RP at 449-50, 503. E.O. explained that, while her mother was not home, Ramirez-Estevez "would start to kiss" E.O. and take off her clothes, usually in E.O.'s mother's bedroom and once in the kitchen while E.O. was taking a nap on the kitchen floor. 3 RP at 450. E.O. never told her mother about the encounters because "[she] was scared [she] was gonna get in trouble" and that "they wouldn't believe [her]." 3 RP at 483-84.
¶ 8 Davis, the sexual assault nurse practitioner who had examined E.O., testified that generally notches on a hymen "do[ ] not always mean sexual abuse" but that E.O.'s notches also were "consistent with [E.O.'s reported] medical history." 3 RP at 593, 595. Ramirez-Estevez objected to this latter part of Davis's testimony, arguing that it was speculative; the trial court overruled this objection.
¶ 9 Wilcox testified briefly about E.O.'s statements that Ramirez-Estevez had raped her. Ramirez-Estevez objected on hearsay grounds, which objection the trial court overruled. E.O.'s aunt also testified briefly about E.O.'s statements that Ramirez-Estevez raped her. Ramirez-Estevez similarly objected on hearsay grounds, which objection the trial court also overruled.
¶ 10 While Detective Kolb was on the witness stand, the State offered into evidence a digital recording of his interview with E.O. Ramirez-Estevez objected, arguing that E.O.'s statements to Kolb were hearsay.[1] Overruling Ramirez-Estevez's objection, the trial court admitted both the transcript and the recording as a prior consistent statement under ER 801(d)(1) because defense counsel's cross-examination of E.O. and other witnesses opened the door to these issues and gave rise "to at least an inference ... of [E.O.'s] recent fabrication." 4 RP at 648.
¶ 11 After the State rested, Ramirez-Estevez moved to dismiss all five counts, arguing that "[n]o reasonable jury could find beyond a reasonable doubt that [Ramirez-Estevez] committed five counts of rape of a child in the first degree." 4 RP at 663. The trial court denied Ramirez-Estevez's motion. Ramirez-Estevez, the sole witness for the defense, then took the witness stand and denied having had any sexual contact with E.O. The jury convicted him of all five counts. Ramirez-Estevez appeals.

ANALYSIS

I. EVIDENTIARY RULINGS
¶ 12 Ramirez-Estevez argues that three of the trial court's evidentiary rulings constitute reversible error: (1) admission of Wilcox's and E.O.'s aunt's hearsay testimony under the excited utterance exception; (2) admission of the digital audio recording of Kolb's interview with E.O.; (3) and admission of Davis's testimony that E.O.'s hymenal notches were consistent with her reported medical history. These arguments fail.

A. Standard of Review
¶ 13 We review evidentiary rulings for an abuse of discretion. State v. Ish, 170 Wash.2d 189, 195, 241 P.3d 389 (2010). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons; an abuse of discretion also occurs when the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law. State v. Lord, 161 Wash.2d 276, 284, 165 P.3d 1251 (2007).

B. Wilcox's and E.O.'s Aunt's Conversations with E.O.
¶ 14 Over Ramirez-Estevez's objections, the trial court admitted as ER 803(a)(2) excited *1261 utterances testimonies from Wilcox and E.O.'s aunt that E.O. had told them that Ramirez-Estevez had raped her. Ramirez-Estevez argues that these testimonies were hearsay, not excited utterances, because E.O. made the statements to them two to three years after the rapes occurred, not spontaneously while under the influence of the rapes. We agree with Ramirez-Estevez that Wilcox's and E.O.'s aunt's testimonies recounted E.O.'s inadmissible hearsay, not excited utterances.[2] But we also agree with the State that admission of these hearsay statements was harmless error.[3]

1. Not "excited utterances"
¶ 15 ER 803(a) provides that "excited utterances" are exceptions to the rule otherwise excluding hearsay statements:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
The State argues that the trial court properly admitted the challenged testimonies under the excited utterance exception to the hearsay rule because Wilcox's and E.O.'s aunt's questioning of E.O. had triggered the stress of excitement caused by recalling the two-year-old rapes. We disagree.
¶ 16 We acknowledge that (1) "`the startling event or condition ... need not be the "principal act" underlying the case,'" State v. Young, 160 Wash.2d 799, 810, 161 P.3d 967 (2007) (quoting State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992)); (2) "[t]he passage of time alone ... is not dispositive" to whether the statements are excited utterances, State v. Strauss, 119 Wash.2d 401, 416-17, 832 P.2d 78 (1992); and (3) a subsequent "startling event may trigger associations with an original trauma, recreating the stress earlier produced and causing the person to exclaim spontaneously," Chapin, 118 Wash.2d at 686-87, 826 P.2d 194, in which case, "it is the later event, not the original trauma, that satisfies the first element of the excited utterance exception." Young, 160 Wash.2d at 810, 161 P.3d 967. In our view, however, the Supreme Court did not intend to stretch the excited utterance exception to circumstances like those here, where the victim was recounting the traumatic events more than two years later; at this much later point, the reliability of an excited utterance close in time to the underlying traumatic event is no longer a predominant reliability factor, and there has been *1262 considerable time for other factors to have intervened.[4]
¶ 17 It is uncontroverted (1) that recalling the rapes was highly stressful and upsetting when E.O. spoke with Wilcox and E.O.'s aunt years after the rapes occurred, and (2) that E.O.'s understandably excited emotions appeared to have been the result of reliving and relating these past traumatic events to these apparently trusted adults. But E.O.'s recollection and recounting of the rapes happened nearly two years after the rapes occurred.[5] Because of this prolonged delay, E.O.'s statements did not constitute the type of excited utterances made under the stress of the event that are admissible under ER 803(a)(2).[6]

2. Harmless error
¶ 18 The State argues that any error was harmless in light of E.O.'s credible testimony about the multiple rapes and other uncontroverted evidence covering the substance of these challenged testimonies, such as Davis's testimony that E.O.'s hymenal notches were consistent with E.O.'s description of the rapes. Ramirez-Estevez counters that, because there was no "extensive medical evidence" to corroborate E.O.'s allegations, Wilcox's and E.O.'s aunt's testimonies recounting E.O.'s hearsay statements were not harmless.
¶ 19 Improper admission of evidence may be harmless error. State v. Bashaw, 169 Wash.2d 133, 143, 234 P.3d 195 (2010). "[A]dmission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted earlier without objection." Ashley v. Hall, 138 Wash.2d 151, 159, 978 P.2d 1055 (1999); see also State v. Dixon, 37 Wash.App. 867, 874-75, 684 P.2d 725 (1984) (erroneous admission of written statement as excited utterance was harmless error where trial judge heard essentially same details in victim's testimony).
¶ 20 The jury heard E.O.'s detailed testimony about Ramirez-Estevez's multiple rapes and observed her demeanor on the witness stand, including during cross-examination by Ramirez-Estevez's trial counsel. Being subject to such cross-examination itself diminished, if not extinguished, the type of prejudice that sometimes results from admission of hearsay where the declarant is not subject to cross-examination at trial. In this way, E.O.'s live testimony in front of the jury eclipsed her earlier consistent recounting of the events to Wilcox and E.O.'s aunt and more than sufficiently supported the jury's verdict. In addition, although not conclusive, Davis's testimony also supported E.O.'s in-court testimony that Ramirez-Estevez had raped her multiple times.
¶ 21 Furthermore, we defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. See State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990). In addition to listening to and watching E.O. on the witness stand, the jury also observed Ramirez-Estevez's demeanor as he denied having raped her. We do not second guess the jury, which obviously believed E.O. and not Ramirez-Estevez. Based on the record before us, we cannot say that "`within reasonable *1263 probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" Bashaw, 169 Wash.2d at 143, 234 P.3d 195 (internal quotation marks omitted) (quoting State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001)). Accordingly, we hold that admission of E.O.'s hearsay statements to Wilcox and E.O.'s aunt was harmless error. We affirm.
¶ 22 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: PENOYAR, C.J., and WORSWICK, J.
NOTES
[1] Ramirez-Estevez's counsel objected to admission of the audio recording, proposing that somebody read the transcript, which the parties had stipulated was admissible. The State argued for admission of both the audio recording and the transcript. The trial court admitted both, but, although it allowed the jury to listen to the recording, it did not give them the transcript.
[2] Wilcox testified about the bilingual teacher's conversation with E.O. in Wilcox's office:

[The State]: Okay. And did you at any time during this ask [E.O.] any specific questions?
[Wilcox]: I asked her what she was so upset about.
[The State]: Okay. And I take it that was probably one of the first questions that you asked after she came in to your office?
[Wilcox]: Yes.
[The State]: Okay. And what did she say about that?
[Ramirez-Estevez]: Objection. Hearsay.
[The State]: Offered as an excited utterance, Your Honor.
[Trial court]: Overruled. Go ahead.
[Wilcox]: She had said that her mom's boyfriend who used to stay with them had raped her.
2 RP at 336-37. Later during trial, E.O.'s aunt testified about her conversation with E.O.:
[The State]: What was her voice like when she was talking to you?
. . . .
[E.O.'s aunt]: It was a voice like crying, like scared.
. . . .
[The State]: And what did she tell you at that time?
[Ramirez-Estevez]: Hearsay.
[Trial court]: Overruled. Go ahead.
[E.O.'s aunt]: That when she was living with [Ramirez-Estevez] he raped her.
. . . .
[The State]: Did you ask her more questions?
[E.O.'s aunt]: Yes.
2 RP at 371-75.
[3] The State also asserts, in the alternative, that Wilcox's and E.O.'s aunt's hearsay testimonies were admissible to provide "context" under the "res gestae" exception to the hearsay rule. Ramirez-Estevez responds that there is no such thing as a "`Res Gestae hearsay exception.'" Reply Br. of Appellant at 1. Because we hold that any error in admitting these statements was harmless, we do not address the State's assertion of a "res gestae hearsay exception" to the hearsay rule.
[4] See Chapin, 118 Wash.2d at 688, 826 P.2d 194 ("[A]s the time between the event and the statement lengthens, the opportunity for reflective thought arises and the danger of fabrication increases. The longer the time interval, the greater the need for proof that the declarant did not actually engage in reflective thought.").
[5] In contrast, almost every case the State cites involved questioning of the victims occurred minutes, hours, or days after the principal act not years later, as here. See, e.g., State v. Williams, 137 Wash.App. 736, 741-42, 154 P.3d 322 (2007) (subsequent questioning occurred less than a couple hours after principal event); State v. Hubbard, 37 Wash.App. 137, 145, 679 P.2d 391 (1984) (subsequent questioning occurred "immediately after" principal act), rev'd on other grounds, 103 Wash.2d 570, 693 P.2d 718 (1985); State v. Canida, 4 Wash.App. 275, 276, 480 P.2d 800 (1971) ("same afternoon"); Johnston v. Ohls, 76 Wash.2d 398, 405-06, 457 P.2d 194 (1969) ("within an hour").
[6] The only case that even remotely compares to the facts here is United States v. Napier, 518 F.2d 316, 317-19 (9th Cir.) (holding that a victim's exclamation, made in response to seeing her assailant's picture in the newspaper nearly eight weeks after the initial assault, was an excited utterance), cert. denied, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975). The two-year delay here, however, eclipses the eight-week delay in Napier.