# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  47379-8-II |
| Respondent, | |
| v. | |
| CHARLES PASCHAL, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Charles Paschal appeals from his convictions for first degree assault, unlawful imprisonment, and first degree rape.  We hold that the trial court improperly admitted prior domestic violence evidence under ER 404(b), and that the admission of this evidence was harmless as to the first degree assault and unlawful imprisonment convictions, but was not harmless as to the first degree rape conviction.  We further hold that (1) the instruction limiting the use of the evidence of Paschal's alleged prior bad act was not a comment on the evidence, (2) the reasonable doubt instruction was not improper, (3) Paschal did not receive ineffective assistance of counsel based on defense counsel's failure to object to certain testimony, and (4) Paschal's double jeopardy and same criminal conduct arguments are moot in light of our reversal of the rape conviction.  We also hold that the trial court erred when it imposed discretionary legal financial obligations (LFOs) without making an individualized inquiry at sentencing into Paschal's ability to pay.  Thus, we affirm Paschal's first degree assault and unlawful imprisonment convictions, but we reverse the first degree rape conviction and remand with instructions to the

trial court to reconsider the discretionary LFOs at resentencing. We also decline to award appellate costs to the State.

FACTS

I. BACKGROUND FACTS

Charles Paschal and Katherine Martin were involved in a long-term romantic relationship for six-and-a-half years. On March 16, 2013, Paschal and Martin were at Martin's home with their two children and Paschal's daughter CP. At some point in the evening, Paschal and Martin started arguing.

According to Martin, Paschal assaulted her for several hours that evening—repeatedly hitting her in the face, removing her clothes, forcing her to perform oral sex, and preventing her from escaping. Paschal would not let Martin leave, and continued beating her periodically, giving her "breaks" during which she could not move. III Verbatim Report of Proceedings (VRP) at 253-54. While he was beating her, Paschal repeatedly told Martin that he was going to "rape [her], kill [her], and take all [of her] money." III VRP at 254.

Paschal also placed Martin in a strangle hold, and covered her mouth and nose with his hand. Paschal released Martin for short moments to allow her to breathe, but would place her back into the strangle hold. Martin was able to break free when Paschal was distracted by his daughters.

Martin ran out through the back door, unclothed, to a neighbor's home, where she called 911. Paschal then left, taking his daughters to CP's mother's home. Officers arrived at the scene, and an ambulance transported Martin to the hospital.

Clark County Deputy Sheriff Andrew Kennison spoke to Martin when the medics were treating her and in the ambulance. Kennison, Clark County Major Crimes Detective Beth Luvera,

and Clark County Major Crimes Unit Supervisor Sergeant Kevin Allais, also spoke to and observed Martin at the hospital. Julie Jorgensen, a Sexual Assault Nurse Examiner (SANE nurse), also examined Martin at the hospital, documented her injuries, and collected forensic information.

## II. Procedural Facts

The State charged Paschal with attempted first degree murder, first degree assault,[1] first degree rape,[2] unlawful imprisonment, and two counts of second degree assault.[3, 4]

### A. Admission of ER 404(b) Evidence

Before trial, the State moved to admit evidence against Paschal of two uncharged 2010 domestic violence assaults involving Martin based on police reports filed with the trial court and photographs of the assaults. The State argued that this evidence was admissible for purposes of evaluating the victim's credibility, to rebut a claim of self-defense, to explain the victim's state of mind at trial, and to explain why Martin felt unable to leave during the unlawful imprisonment. Over Paschal's objection, the trial court admitted the prior acts evidence stating that *State v.*

---

[1] Count 2 alleged that Paschal committed first degree assault with intent to inflict great bodily harm and that he assaulted Martin "by any force or means likely to produce great bodily harm." Clerk's Papers (CP) at 10.

[2] Count 3 alleged that Paschal had engaged in sexual intercourse by forcible compulsion and "did inflict serious physical injury" on the victim. CP at 10.

[3] Count 4 alleged that Paschal committed second degree assault by intentionally assaulting Martin "by strangulation or suffocation." CP at 10. Count 5 alleged that Paschal committed second degree assault by intentionally assaulting Martin and recklessly inflicting substantial bodily harm.

[4] The State also charged Paschal with two counts of witness tampering. The trial court dismissed the witness tampering charges during trial for insufficient evidence and they are not relevant to this appeal.

*Baker*,[5] "kind of opened the door just wide on this area a lot more," expanding the admissibility of prior acts of domestic violence to allow the jury to assess a victim's credibility. II VRP at 80. The trial court also commented that the history of domestic violence would also be relevant to any evidence suggesting the victim was placating her assailant and for Paschal's self-defense claim. II VRP at 82.

## B. TRIAL TESTIMONY

Martin, Kennison, Luvera, Allais, Jorgensen, and various medical personnel testified for the State. Paschal, CP, and CP's mother testified for the defense.

### 1. STATE'S EVIDENCE

#### a. MARTIN

In addition to testifying to the incident as described above, Martin also testified that in 2010 she and Paschal got into an argument and Paschal broke her nose, which testimony relates to the two uncharged 2010 domestic violence assaults the trial court previously admitted. Martin testified that she called the police and went to the hospital in an ambulance, but that she left without treatment because it was taking too long. The State then admitted a photograph of Martin after the 2010 incident.

#### b. DEPUTY KENNISON

Kennison testified that when he arrived at Martin's neighbor's home, the medics were already treating Martin. Kennison got into the ambulance with Martin and asked her what happened. Kennison testified that Martin was "panicky" and "scared." She told Kennison she was

---

[5] 162 Wn. App. 468, 259 P.3d 270 (2011).

concerned about the children, Paschal had punched her in the face several times, and Paschal had sat on top of her. II VRP at 157.

Kennison also spoke to Martin at the hospital. At that time, Martin was still upset, law enforcement had not yet located Paschal, and Martin was concerned about her children. Martin told Kennison that Paschal had sexually assaulted her by attempting to force her to perform oral sex.

Kennison also testified that Martin had told him that she and Paschal had been involved in previous domestic violence incidents. Kennison further testified that Martin's injuries appeared to be consistent with "be[ing] punched repeatedly" and were consistent with her account of events. II VRP at 157. Paschal's counsel did not object to Kennison's testimony regarding Martin's statements or his opinion regarding the nature of her injuries in relation to her story.

c.    DETECTIVE LUVERA

Luvera testified that she also spoke with Martin at the hospital approximately two hours after police responded to the 911 call. Luvera stated that Martin had a "tremendous amount of injury to her face," [and] was "crying and very emotional, and very upset," and "blurted some things out immediately." III VRP at 318-20. These "things" included Martin stating that Paschal was a wrestler and he had her in "a hold," but she was able to bite his hand. III VRP at 320. Martin further stated that (1) she had felt like she was going to die, (2) when she asked Paschal why he was doing this to her, he would hit her again, and (3) he told her that he was going to "rape" her and attempted to put his penis in her mouth. III VRP at 320. When Luvera asked about their relationship, Martin described a bad relationship and said that there had always been some physical

abuse, such as slapping, hair pulling, and pushing, in the relationship and that Paschal had "backhanded her" and given her a bloody nose in 2010. III VRP at 322.

Luvera also testified that the injuries to Martin's face were consistent with her account of events, and that, in her (Luvera's) experience, domestic violence victims are consistent with their explanations as to how their injuries occurred. Luvera observed that Martin's left eye was completely red and she had petechia[6] on her neck and face and testified that these injuries were consistent with strangulation. Luvera photographed Martin's extensive injuries, and the trial court admitted the photographs into evidence. Paschal did not object to Luvera's testimony regarding Martin's statements or her injuries.

    d.    SERGEANT ALLAIS

Allais testified that he arrived at the hospital about 75 minutes after the 911 call. Allais observed that Martin appeared to have been strangled, noting that she had petechial, redness around her neck, and broken blood vessels in her eyes.

During direct examination, Allais testified that based on Martin's injuries, the assault was "probably the worst domestic assault that [he'd] seen." IV VRP at 449. During cross-examination, Paschal's counsel questioned Allais about his evaluation of the case,

> [Defense Counsel]: Now . . . one of the first statements you made when you took the stand today, is . . . this was the worst case of domestic violence you've ever witnessed?
>
> [Allais]: One of the worst—did I say worst?
>
> [Defense Counsel]: That's what I heard.
>
> [Allais]: I'll tell you what the worst was. We had a homicide involving - - .

---

[6] Petechiae are "little spots caused by leakage of the blood vessel" caused by "backward pressure in the blood vessels." IV VRP at 511.

[Defense: Counsel]:  Was that a hammer one . . .?

. . . .

[Allais]:  Yes.  That would be the worst.

IV VRP at 493-94.

e.    DR. EGGEN

Dr. John Todd Eggen treated Martin at the hospital.  He testified that her face was very swollen, that her right eye was red from a subconjunctival hemorrhage, that her nasal bone was fractured, and that she had petechiae in her head and neck area.  He further testified that the presence of petechial on the head and neck can indicate a person had been choked but that it can also be caused by repetitive vomiting or intense and repetitive crying, coughing, or sneezing.  In addition, he testified that the force necessary to cause petechiae could be life threatening if it involved an airway.  He further testified that some of Martin's bruising was "[f]easibly" consistent with strangulation and that many of her injuries were consistent with having been punched in the face forcibly and repeatedly.  IV VRP at 516.

Dr. Eggen also testified that Martin had stated that Paschal had "held [her] captive" for about three hours, hit her in the face with his fist, and penetrated her mouth with his penis.  IV VRP at 520.  She also stated that she had lost consciousness.  Paschal did not object to any of this testimony.

f.    NURSE RUEF

Nurse Anna Ruef, an emergency room nurse, conducted Martin's intake at the hospital.  Ruef testified that when Martin arrived in the ambulance, she sounded frightened, was tearful, and was crying.  She told Ruef that Paschal had "held [her] captive" for two hours and had beaten and

assaulted her. IV RP at 537. Ruef observed abrasions and bruising all over Martin's body. Ruef testified that "this is the most severe case of domestic violence [she had] seen in the [emergency room] throughout [her] practice." IV VRP at 538. Defense counsel did not object to any of this testimony.

g. NURSE JORGENSEN

SANE nurse Jorgensen examined Martin at the hospital, documented her injuries as substantial, and collected forensic information. Jorgensen testified that Martin's injuries included injuries suggesting strangulation, and that her injuries were so extensive it required two pages to document them.

Jorgensen also asked Martin about what had happened and testified about Martin's statements to her. Martin told her that Paschal had punched her in the head and face with his fist; dragged her around the house; continued to hit her; put her in a "head lock choke hold," which prevented her from breathing; put his hand over her mouth; attempted to put his penis in her mouth; and performed oral sex on her. V VRP at 627. Defense counsel did not object to Jorgensen's testimony regarding Martin's statements to her or Jorgensen's comments about the nature of Martin's injuries.

h. MEDICS BUSTAMANTE AND CHRISTOPHER

Paul Bustamante, one of the medics who assisted Martin, was also Martin's best friend's husband. He testified that Martin's facial injuries were so extensive that he did not recognize her until she told him who she was even though he had seen her two or three times before that day. Her face was swollen and bruised and had dried blood on it, and she had difficulty opening her eyes.

Bustamante also testified that when he was initially examining Martin, she told him that she had been "assaulted and had to leave her children at home." III VRP at 203. Later, in the ambulance, she told him that her boyfriend had physically assaulted her, raped her, choked her, held his hand over her mouth and impaired her breathing, and held her inside her home for several hours before she was able to escape to the neighbors. Bustamante stated that when Martin made these statements, she was upset and distraught.

Bustamante further testified that Martin's injuries appeared to be consistent with her description of what had happened to her. He commented that her injuries were, in his opinion, "perfectly consistent with what would happen if you were repeatedly struck in the face by a closed fist" and were consistent with the timeline Martin had provided. III VRP at 208. The injuries that she appeared to have sustained while fleeing to the neighbors, which required her to climb over "multiple fences and bushes" with no clothing to protect her, appeared to be fresher than her other injuries. III VRP at 208-09.

Thomas Christopher, another medic who attended to Martin, testified that when they first contacted Martin, she was "very distraught and upset" and that she was crying. III VRP at 223. He observed the same injuries Bustamante observed, and heard Martin give the same description of what had happened to her. Defense counsel did not object to any of this testimony.

2. DEFENDANT'S EVIDENCE

a. PASCHAL'S TESTIMONY

Paschal asserted that he had struck Martin in self-defense. But he admitted to hitting Martin in the face out of anger five times and to causing the injury to her nose. He denied causing her other injuries or attempting to strangle her. Paschal also admitted that he prevented Martin from

leaving the house when she tried to run out of the front door and that he refused to call 911 when she had asked him to call, but he asserted that he told Martin that he would take her to the hospital after they "clean[ed] up." V VRP at 710.

In addition to recounting his version of the events and to dispute Martin's claim that he threatened to take all of her money, Paschal testified that he was self-employed as a club promoter and barber. Paschal estimated that he could earn between $50,000 and $100,000 a year.

b. CP'S AND CP'S MOTHER'S TESTIMONY

CP testified that the only noises she heard the night of the incident were immediately before Paschal took her and her sister from the house. She testified that she and her sister were watching a movie in her father's bedroom when she "heard thumping and screaming from outside of the bedroom door." V VRP at 751. She opened the door and saw Martin on the floor with Paschal standing there with his fist raised. He then grabbed CP and CP's sister and ran out of the house. Martin attempted but failed to grab CP and CP's sister from Paschal.

CP's mother testified about Paschal arriving at her house with CP and CP's sister. She testified that he appeared to be distressed, that he had scratches on his face and neck, that he had a "busted" lip, and that his shirt was badly ripped. V VRP at 756.

C. JURY INSTRUCTIONS

In its written instructions to the jury, the trial court gave the jury a limiting instruction related to the 2010 domestic violence incident. This instruction stated,

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony and/or photographs pertaining to a previous incident in 2010 between the defendant and Katherine Martin and may be considered by you *only for the purpose of assessing Katherine Martin's credibility and/or assessing her actions on March 17, 2013*. You may not consider it for any

other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Clerk's Papers (CP) at 76 (emphasis added). Neither party objected to this limiting instruction.

The trial court also gave the jury the following reasonable doubt instruction which stated in part,

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 75.

The jury convicted Paschal of first degree assault, first degree rape, unlawful imprisonment, and two counts of second degree assault. It acquitted him of attempted first degree murder.[7]

D. SENTENCING

At sentencing, Paschal moved to merge his first degree assault, second degree assault, and unlawful imprisonment convictions into his first degree rape conviction and to dismiss the assault and unlawful imprisonment convictions on double jeopardy grounds. He argued that (1) the assaults were used to elevate the rape to a first degree rape and (2) the unlawful imprisonment was merely incidental to the first degree rape. He further argued that all of his offenses constituted the same criminal conduct for sentencing purposes.

The trial court vacated Paschal's two second degree assault convictions on double jeopardy grounds and merged them with the first degree assault. However, the trial court did not merge his

_____

[7] The jury also found that the domestic violence special allegation applied to all guilty verdicts.

11

remaining convictions and refused to find that they were the same criminal conduct for purposes of calculating Paschal's offender score. The trial court sentenced Paschal to 360 months.

The trial court also ordered Paschal to pay restitution and both mandatory and discretionary LFOs. Before imposing the LFOs, the court stated,

> I am making the finding as to ability to pay based on the testimony I heard at trial, that the defendant is presently indigent, but is anticipated to be able to pay in the future.

VII VRP at 933. The trial court indicated the same on the judgment and sentence. Paschal appeals.

## ANALYSIS

### I. 404(b) EVIDENCE

Paschal first argues that the trial court erred when it admitted the evidence of prior uncharged acts of domestic violence in 2010 and allowed Luvera to testify that Martin told her Paschal had engaged in ongoing domestic violence. He contends that this evidence was prejudicial as to the first degree assault, the unlawful imprisonment, and the first degree rape convictions.[8] The State concedes that under *State v. Gunderson*,[9] the trial court erred in admitting this evidence for purposes of assessing Martin's credibility, but the State argues that the error was harmless because the evidence was properly admitted for other purposes. We agree that the trial court erred in admitting this evidence for purposes of assessing Martin's credibility. We further hold that this

---

[8] Paschal also argues that the trial court's error in admitting the evidence of the alleged prior act of domestic violence violated his constitutional right to due process. But it is well-settled that evidentiary errors, such as an erroneous admission of ER 404(b) evidence, are not constitutional errors. *State v. Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009). Therefore, we do not address this argument.

[9] 181 Wn.2d 916, 337 P.3d 1090 (2014).

12

error was harmless as to the assault and unlawful imprisonment convictions but that it was not harmless as to the rape conviction. Thus, we reverse the first degree rape conviction.

A.   ADMISSIBILITY

We review a trial court's interpretation of the rules of evidence de novo; but we review the trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). A trial court abuses its discretion if its "'decision is manifestly unreasonable or based upon untenable grounds or reasons.'" *Gunderson*, 181 Wn.2d at 922 (quoting *State v. Brown*, 132 Wn.2d 529, 572, 940 P.2d 546(1997)).

Evidence of a defendant's prior bad acts is not admissible to show the defendant's propensity to commit a crime, but it may be admissible for other, proper purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). "The State must meet a substantial burden when attempting to bring in evidence of prior bad acts under one of the exceptions." *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

> To admit evidence of a defendant's other wrongdoings, the trial court must
>
> (1) find by a preponderance of the evidence that the wrongs occurred; (2) identify the purpose for which the evidence is sought to be introduced; (3) determine whether the evidence is relevant to prove an element of the crime with which the defendant is charged; and (4) weigh the probative value of the evidence against its prejudicial effect.

*State v. Baker*, 162 Wn. App. 468, 473, 259 P.3d 270 (2011). The trial court must identify the purpose of the evidence and conduct the balancing test on the record. *State v. Wade*, 98 Wn. App. 328, 334, 989 P.2d 576 (1999). The court should resolve doubtful cases in favor of the defendant. *Wade*, 98 Wn. App. at 334.

Here, the court admitted the 2010 domestic violence evidence and instructed the jury,

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony and/or photographs pertaining to a previous incident in 2010 between the defendant and Katherine Martin and may be considered by you only for the purpose of assessing Katherine Martin's credibility and/or assessing her actions on March 17, 2013. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

CP at 77. The trial court did not, however, limit the purpose for which the jury could consider Luvera's additional testimony that Paschal had engaged in other acts of domestic violence, such as slapping, hair-pulling, and pushing, throughout the couple's relationship.

Admission of prior acts of domestic violence to assess a victim's credibility when the victim does not contradict her story or recant is improper. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016); *Gunderson*, 181 Wn.2d at 924-25. Martin did not contradict her story or recant. Thus, the trial court's admission of the prior domestic violence assaults for the purpose of assessing Martin's credibility was error under *Ashley a*nd *Gunderson.* We next consider whether this error is harmless error as to each conviction.

B.      HARMLESS ERROR

When analyzing the improper admission of 404(b) evidence, we determine whether, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

1.      FIRST DEGREE ASSAULT

We first examine whether the erroneous admission of the prior bad acts evidence was harmful as to the first degree assault conviction. The first degree assault charge required the State

to prove that Paschal committed first degree assault by assaulting Martin with intent to inflict great bodily harm and that he assaulted her with "any force or means likely to produce great bodily harm." CP at 10. "Great bodily harm" is defined as "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(c).

Given the strong evidence of the assault, the evidence of the 2010 incident and the ongoing abuse during the relationship was harmless. For instance, Martin testified that Paschal hit her several times in the head and face with a closed fist. And Paschal, a state champion wrestler and "trained fighter," corroborated this testimony by testifying that he struck Martin's face and head "five times with [his] back hand, pow, pow, pow, pow, pow," and that, although he had initially struck her because she was hitting him, he did so out of anger. V VRP at 705-07. This evidence was strong evidence that Paschal assaulted Martin with intent to inflict great bodily harm that was not affected by the jury's knowledge of a history of domestic violence or its evaluation of Martin's credibility.

Furthermore, the nature of Martin's injuries demonstrate that Paschal used force or means likely to produce great bodily harm. For instance, there was clear evidence of strangulation that the jury could have concluded created a possibility of death or significant impairment of bodily functions. This evidence is strong evidence of a use of force or means likely to produce great bodily harm that was not affected by the jury's knowledge of prior domestic violence or its evaluation of Martin's credibility.

Because the record contains evidence of first degree assault that is sufficient to allow us to conclude that "within reasonable probabilities, had the error not occurred, the outcome of the trial

would have been materially affected," any error in admitting the evidence of the prior domestic violence history was harmless as to the first degree assault conviction. *Smith*, 106 Wn.2d at 780.

2.      UNLAWFUL IMPRISONMENT

We next examine whether the erroneous admission of the prior bad acts evidence was harmful as to the first degree assault conviction. Again, we hold that any error was harmless.

To prove unlawful imprisonment, the State had to prove that Paschal knowingly restrained Martin. RCW 9A.40.040(1). Paschal testified that he prevented Martin from leaving the house when she attempted to run out the front door and that he refused to call for help. This evidence is sufficient to support the conclusion that Paschal knowingly restrained Martin, and it is highly unlikely that it would have been materially affected by the erroneously admitted evidence. Thus, any error in admitting the evidence of the prior domestic violence history was harmless as to the unlawful restraint conviction. *Smith*, 106 Wn.2d at 780.

3.      FIRST DEGREE RAPE CONVICTION

We now turn to the first degree rape conviction. Unlike the first degree assault and unlawful restraint convictions, all of the evidence corroborating the rape was potentially affected by Martin's credibility. The only evidence of the rape came in through Martin's direct testimony and hearsay statements. Without any corroborating evidence of the rape, there is a reasonable probability that, but for the error, the verdict on the rape charge would have been materially affected by erroneously admitted evidence relating to Martin's credibility. We hold that the trial court's error in admitting Paschal's prior domestic violence evidence was not harmless as to the first degree rape conviction, and we reverse that conviction.

## II.  JURY INSTRUCTIONS

Paschal next challenges two jury instructions.  He argues that (1) the limiting instruction related to the domestic violence evidence was an improper judicial comment on the evidence and (2) the reasonable doubt instruction misstated the burden of proof.  Presuming, but not deciding whether these issues were properly preserved,[10] we hold that these instructions were not improper.[11]

### A.  LIMITING INSTRUCTION—NO JUDICIAL COMMENT

Paschal argues that the trial court improperly commented on the evidence in jury instruction number 5, the limiting instruction regarding the alleged 2010 domestic violence incident.  We disagree.

The Washington Constitution explicitly prohibits judicial comments on evidence.  WASH. CONST. art. IV, § 16; RAP 2.5(a)(3); *State v. Levy*, 156 Wn.2d 709, 719-20, 1132 P.3d 1076 (2006).  "Any remark that has the potential effect of suggesting that the jury need not consider an element of an offense could qualify as judicial comment."  *Levy*, 156 Wn.2d at 721.

As discussed above, jury instruction number 5 states,

> Certain evidence has been admitted in this case for only a limited purpose.  This evidence consists of testimony and/or photographs pertaining to a previous incident in 2010 between the defendant and Katherine Martin and may be considered by you only for the purpose of assessing Katherine Martin's credibility and/or assessing her actions on March 17, 2013.  You may not consider it for any other purpose.  Any discussion of the evidence during your deliberations must be consistent with this limitation.

---

[10] RAP 2.5(a).

[11] We review challenged jury instructions de novo, in the context of the instructions as a whole. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).

CP at 77.

Even if we agree with Paschal's argument that the instruction assumes that the 2010 domestic violence incident occurred, it is not a comment on the evidence, and the trial court instructed the jury to consider the evidence and testimony. In the trial court's written instructions to the jury, none of the "to convict" instructions required proof of the 2010 incident as an element of the crimes charged. Further, the aggravating domestic violence instruction, number 39, did not require proof of the 2010 incident as an element the jury needed to find. The trial court's instruction did not remove a disputed factual issue from the jury's consideration of Paschal's guilt or innocence. Therefore, we hold that jury instruction number 5 was not an improper comment on the evidence.

## B. REASONABLE DOUBT INSTRUCTION

Paschal next argues that the trial court's reasonable doubt instruction infringed on his right to due process because it (1) improperly focused the jury on a search for the truth and (2) instructed the jurors that they need to provide a reason for any doubt. We reject this argument for the reasons stated in *State v. Parnel*, 195 Wn. App. 325, 381 P.3d 128 (2016), *petition for review filed*, and *State v. Kinzle*, 181 Wn. App. 774, 784-85, 326 P.3d 870, *review denied*, 181 Wn. App. 774 (2014).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Paschal next argues that he received ineffective assistance of counsel when defense counsel failed to object (1) to Martin's hearsay statements to testifying law enforcement officers and medical staff who treated her, (2) to Sergeant Allais's statement that the assault was the "worst"

domestic violence incident he has seen, and (3) to law enforcement officers' opinions that Martin's injuries were consistent with her account of events related to the assault. We disagree.[12]

A.    LEGAL PRINCIPLES

We review a claim of ineffective assistance of counsel de novo, and presume that counsel's performance was adequate and reasonable. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's performance was deficient and that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Deficient performance is that which falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Conduct categorized as legitimate trial tactics or strategies is not deficient performance. *Grier*, 171 Wn.2d at 33.

B.    HEARSAY STATEMENTS

We first examine whether defense counsel provided ineffective assistance by failing to object to various hearsay testimony. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c); *State v. Hudlow*, 182 Wn. App. 266, 278, 331 P.3d 90 (2014). Hearsay is inadmissible unless an exception or exclusion applies. ER 802. Paschal argues that none of the hearsay he

---

[12] Because we reverse the first degree rape conviction, we do not address whether defense counsel should have objected to the hearsay statements that are relevant only to the rape conviction.

challenges fits within any hearsay exception. We disagree and hold that the challenged hearsay statements are admissible as excited utterances[13] or as statements for the purposes of medical diagnosis or treatment.[14] Thus, defense counsel's failure to object was not deficient performance.

1.    EXCITED UTTERANCES

Excited utterances are admissible under ER 803(a) as an exception to hearsay. An excited utterance is "[A] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). To be admissible, the proponent of an excited utterance must satisfy three requirements, "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." *State v. Young*, 160 Wn.2d 799, 806, 161 P.3d 967 (2007). Paschal does not challenge the first and third factor. Thus, we address only whether Martin was still "under the stress of excitement of the starting event or condition." *Young*, 160 Wn.2d at 806.

The second factor must be established by extrinsic evidence beyond the declarant's "bare words." *Young*, 160 Wn.2d at 809-10. The extrinsic evidence can include circumstantial evidence "such as the declarant's behavior, appearance, and condition, appraisals of the declarant by others, and the circumstances under which the statement is made." *Young*, 160 Wn.2d at 810.

Although time is a consideration in determining whether the statement is an excited utterance, we acknowledge that "'[t]he passage of time alone . . . is not dispositive'" to whether

---

[13] ER 803(a)(2).

[14] ER 803(a)(4).

the statements are excited utterances. *State v. Ramirez-Estevez*, 164 Wn. App. 284, 292-93, 263 P.3d 1257 (2011) (alteration in original) (quoting *State v. Strauss*, 119 Wn.2d 401, 416-17, 832 P.2d 78 (1992)). The "'key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.'" *Young*, 160 Wn.2d at 807-08 (alternation in original, internal quotation marks omitted) (quoting *Strauss*, 119 Wn.2d at 416). The statement need not be completely spontaneous and may be in response to a question. *State v. Bache*, 146 Wn. App. 897, 904, 193 P.3d 198 (2008).

Paschal challenges the testimony admitted as excited utterances that came in through Kennison, Luvera, and Allais. Kennison testified that when he spoke to Martin at the scene while she received medical treatment, she was "panicky, scared" and appeared to be in a lot of pain. II VRP at 157. When he spoke to her again about an hour later at the hospital, Martin was calmer, but she was still upset over her missing children. Similarly, Detective Luvera testified that Martin was "crying, very emotional, [and] very upset" and "blurted some things out immediately" when Luvera arrived to interview her at the hospital. III VRP at 319-20. Martin was emotional and distraught throughout the interview, and Luvera stated that Martin would alternate between being able to talk and crying. And Sergeant Allais testified that when he arrived at the hospital, Martin was "crying, [and] very upset about where her daughter was," which seemed to be her primary concern. IV VRP at 449. Throughout the interview Martin was "crying, sobbing, [and] despondent." IV VRP at 455.

Martin's demeanor during her police contacts supports the admission of her statements to the officers as excited utterances. Based on the testimony about her demeanor, Martin was still

under the stress of the assault and was panicked over her children's unknown whereabouts. Even if Paschal's counsel had objected, it is unlikely that the court would have excluded the statement and any objection would have been futile. Thus, Paschal does not establish that counsel's failure to object would have been prejudicial, and his claim of ineffective assistance of counsel for failure to object to the hearsay testimony fails. *See State v. Trujillo*, 153 Wn. App. 454, 461, 222 P.3d 129 (2009) (failure to challenge arrest and subsequent search would have "been futile," so appellant failed to establish prejudice).

Furthermore, even if defense counsel should have objected to the excited utterance testimony about the assault and unlawful imprisonment that was introduced through Kennison's, Luvera's, and Allais's testimony,[15] the same evidence was introduced through Dr. Eggen, nurse Ruef, and the medics. Because this same evidence was introduced through other sources, it is unlikely that there is a reasonable probability the proceedings would have been different, and Paschal cannot show that defense counsel's failure to object to Kennison's, Luvera's, and Allais's testimony was prejudicial.

2.      STATEMENTS FOR PURPOSES OF MEDICAL DIAGNOSIS OR TREATMENT

Paschal next argues that he was prejudiced by defense counsel's failure to object to nurse Jorgensen's testimony because Jorgensen did not diagnose Martin and, thus, her statements to Jorgensen were not admissible under ER 803(a)(4). We disagree.

Statements made for medical diagnosis and treatment are admissible as exceptions to the hearsay rule under ER 803(a)(4). "Statements made for purposes of medical diagnosis or treatment

---

[15] We note again that we are not considering the rape evidence because we reverse that conviction on other grounds.

and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause of external source thereof insofar as reasonably pertinent to diagnosis or treatment," fall under this exception. ER 803(a)(4). "A party demonstrates a statement to be reasonably pertinent [to diagnosis or treatment] when (1) the declarant's motive in making the statement is to promote treatment, and (2) the medical professional reasonably relied on the statement for purposes of treatment." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007). A declarant's statement to a treatment provider does not, however, have to be solely related to medical diagnosis or treatment; it may be for a combination of purposes, including medical and forensic purposes. *See Williams*, 137 Wn. App. at 746-47.

Martin's statements to Jorgensen aided Jorgensen in determining the necessary course of treatment and examination. Martin told Jorgensen what happened and what caused her injuries, which Jorgensen documented in her medical chart. Martin's statements about her injuries and the assault were given for the purpose of Jorgensen treating Martin's injuries. Thus, Martin's statements about the assault were admissible through the medical treatment exception. Even if counsel had objected to Jorgensen's testimony about Martin's statements, the court likely would not have sustained the objection and the trial outcome would not have been materially different.

Furthermore, even if defense counsel should have objected to Jorgensen's testimony, similar evidence was introduced through Dr. Eggen, nurse Ruef, and the medics. Because this same evidence was introduced through other sources, it is unlikely that there is a reasonable probability the proceedings would have been different, and Paschal cannot show that defense counsel's failure to object the Jorgensen's testimony was prejudicial.

C.    COMPARISON OF DOMESTIC VIOLENCE CASE

Paschal further argues that he was prejudiced by counsel's failure to object to Allais's testimony that this was the worst domestic assault he had seen.  Paschal argues that this comment was irrelevant and "likely inflamed the passions and prejudices of jurors."  Br. of Appellant at 26.  Paschal fails to establish ineffective assistance of counsel on this ground.

Paschal ignores the fact that, on cross-examination, defense counsel questioned Allais about his statement.  During his direct examination, Allais stated, "I have done this for 26 years, and as I looked at her I was thinking this is probably the worst domestic assault that I've seen."  IV VRP at 449.  Although defense counsel did not object to Allais's statement on direct examination, during cross-examination the following exchange occurred:

> [Defense Counsel]:  Now . . . one of the first statements you made when you took the stand today, is . . . this was the worst case of domestic violence you've ever witnessed?
>
> [Allais]:  One of the worst—did I say worst?
>
> [Defense Counsel]:  That's what I heard.
>
> [Allais]:  I'll tell you what the worst was.  We had a homicide involving - - .
>
> [Defense Counsel]:  Was that a hammer one . . .?
>
> . . . .
>
> [Allais]:  Yes.  That would be the worst.

IV VRP at 493-94.  Counsel elicited from Allais that Martin's injuries were not the worst that he had seen.  Based on counsel's performance and clarification, it is likely that the comparison testimony, while irrelevant, was a trial tactic to demonstrate Allais's bias and cast some doubt on

his opinions and testimony. Thus, we hold that counsel's performance did not fall below an objective standard of reasonableness and was not deficient.

Furthermore, even if defense counsel should have objected to this testimony, similar evidence was introduced through nurse Ruef, who testified, without objection, "[T]his is the most severe case of domestic violence I've seen in the [emergency room] throughout my practice." IV VRP at 538. Because this evidence would have been before the jury even if defense counsel had objected to Allais's testimony, there is no reasonable probability that the outcome of the proceedings would have been different. Accordingly, Paschal cannot show prejudice and this ineffective assistance of counsel argument fails.[16]

D.      DETECTIVE LUVERA'S AND DEPUTY KENNISON'S OPINION TESTIMONY

Paschal next argues that counsel's failure to object to Luvera's and Kennison's testimony that Martin's injuries were consistent with her account of events was deficient performance and was prejudicial as to the first degree assault and unlawful imprisonment.[17] Even presuming that this opinion testimony was improper, we disagree that there was prejudice.

Improper admission of evidence may be harmless error if there is other credible testimony and other uncontroverted evidence similar to the challenged testimony that was been admitted

---

[16] Paschal also suggests that even if Martin's excited utterances and statements for purposes of diagnosis and treatment were admissible, defense counsel should have objected to this hearsay evidence under ER 403 because it was cumulative in light of its repetitive nature and Martin's testimony. Given the other evidence establishing the assault and the unlawful imprisonment, we hold that there is no reasonable likelihood that the cumulative nature of the hearsay evidence would have affected the outcome of this trial as to the assault and unlawful imprisonment charges. Thus, Paschal fails to establish ineffective assistance of counsel on this ground.

[17] Because we reverse the first degree rape conviction, we do not address whether this opinion testimony was prejudicial as to the rape.

without objection. *Ramirez-Estevez*, 164 Wn. App. at 293. Here, as discussed above, there was considerable evidence, including Paschal's testimony, to prove the assault and unlawful imprisonment. Furthermore, both Dr. Eggen and nurse Jorgensen testified that Martin's injuries were consistent with strangulation. For instance, Dr. Eggen testified that some of Martin's bruising was "[f]easibly" consistent with strangulation and that many of her injuries were consistent with having been punched in the face forcibly and repeatedly. IV VRP at 516. And Jorgensen testified that Martin's injuries included injuries that suggested strangulation.

Given this evidence, we cannot say that within reasonable probabilities, that but for the error, that the outcome of the trial would have been materially affected as to the assault and unlawful imprisonment convictions. Thus, we hold that to the extent this was improper opinion testimony, it was harmless error, and Paschal fails to show that he was prejudiced by counsel's deficient performance. His claims of ineffective assistance of counsel fail.

IV. SENTENCING

Paschal further argues that the trial court erred when it (1) refused to merge his first degree rape and first degree assault convictions, which violated double jeopardy and (2) found that his first degree rape and first degree assault convictions were not the same criminal conduct under RCW 9.94A.589(1)(a).[18] Because we reverse the rape conviction, both the merger and same criminal conduct issues are moot, and we decline to further address those issues. However, because we reverse the first degree rape conviction, we remand for resentencing.

---

[18] The legislature amended RCW 9.94A.589(1)(a) in 2015. Laws of 2015, 2d Spec. Sess., ch. 3, § 13. This amendment did not change the language relevant to this opinion. Accordingly, we cite to the current version of the statute.

V. LEGAL FINANCIAL OBLIGATIONS

Paschal next argues, for the first time on appeal, that the trial court erred when it imposed LFOs[19] without making an individualized inquiry into his current and future ability to pay them. Generally, we may decline to review issues raised for the first time on appeal. RAP 2.5(a). But, as our Supreme Court in *Blazina*[20] noted, we may exercise our discretion to reach unpreserved claims of error. *State v. Blazina*, 182 Wn.2d 827, 832-33, 344 P.3d 680 (2015). We exercise our discretion here and reach Paschal's challenge to the imposed discretionary LFOs.

RCW 10.01.160(3) provides,

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

Paschal testified at trial that he was self-employed barber and club promoter. He testified that he could earn at least $25,000 to $30,000 a year as a barber, that he could make about $2,000 a night as a club promoter, and that he would promote about 20 shows a year. In determining that Paschal had the ability to pay, the trial court relied solely on Paschal's trial testimony regarding his income. Although there was no evidence to contradict Paschal's testimony, the trial court failed to make any individualized inquiry into Paschal's future ability to pay, including the impact that incarceration would have on his future income and future employment as required under *Blazina*. *Blazina*, 182 Wn.2d at 838-39. Thus, we hold that the trial court erred when it imposed discretionary LFOs on Paschal without making an individualized inquiry into his current and future

---

[19] Paschal does not distinguish between mandatory and discretionary LFOs.

[20] *Blazina* only applies to discretionary LFOs.

ability to pay, and we reverse the discretionary LFOs and remand to the trial court to make such an inquiry consistent with *Blazina*.

## VI. APPELLATE COSTS

Finally, Paschal asks that we decline to impose appellate costs should the State be the prevailing party in this appeal because he is indigent. We exercise our discretion under RCW 10.73.160(1) and decline to impose appellate costs.

## CONCLUSION

Thus, we affirm Paschal's first degree assault and unlawful imprisonment convictions, but we reverse the first degree rape conviction and remand for proceedings consistent with this opinion. We also decline to award appellate costs to the State.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

JOHANSON, P.J.

MELNICK, J.